ALASKA BULK CARRIERS, INC.,
Trinidad Corporation, Appellants,

v.

Juanita M. KREPS, Secretary of
Commerce, U.S. Department of
Commerce, et al.

SHELL OIL COMPANY (a Delaware
Corporation), Appellant,

v.

Juanita M. KREPS (Individually and as
Secretary of the United States Department
of Commerce Acting in her Official
Capacity), et al.

ALASKA BULK CARRIERS, INC.,
Trinidad Corporation

v.

Juanita M. KREPS, Secretary of Commerce,
U.S. Department of Commerce,
et al., Polk Tanker Corporation, et al.,
Appellants.

SHELL OIL COMPANY (a
Delaware Corporation)

v.

Juanita M. KREPS (Individually and as
Secretary of the United States Department
of Commerce Acting in her Official
Capacity), et al., Seatrain Shipbuilding
Corp. and Polk Tanker Corp., Appellants.

Nos. 77–2080, 78–1211, 78–1212
and 78–1281.

United States Court of Appeals,
District of Columbia Circuit.

Argued 16 Oct. 1978.

Decided 6 Feb. 1979.

Rehearing Denied 22 March 1979.

Rehearing En Banc Denied 3 April 1979.

Certiorari Granted June 18, 1979.
See 99 S.Ct. 2880.

Amy Loeserman Klein, Washington, D. C., with whom Olga Boikess and William Karas, Washington, D. C., were on the brief, for appellants in No. 77–2080.

Stephen N. Shulman, Washington, D. C., with whom Joseph A. Artabane and Mark C. Ellenberg, Washington, D. C., were on the brief, for appellant in No. 78–1211.

Michael Kimmel, Atty., Dept. of Justice, Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Barbara Allen Babcock, Asst. Atty. Gen., and Ronald R. Glancz, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellees, Juanita M. Kreps, Secretary of Commerce, et al.

William E. McDaniels, Washington, D. C., with whom John W. Vardaman, Jr. and Jane E. Genster, Washington, D. C., were on the brief, for appellees, in No. 77–2080 and No. 78–1211 and cross-appellants in No. 78–1212 and No. 78–1281.

Also John M. Rogers, Atty., Dept. of Justice, Washington, D. C., entered an appearance for appellee, Juanita M. Kreps, Secretary of Commerce, et al.

Also Neal Michael Mayer, Washington, D. C., entered an appearance for appellee, Polk Tanker Corp., et al. in No. 77–2080.

Also Jonathan Blank, Washington, D. C., entered an appearance for appellee, Polk Tanker Corp., et al. in No. 77–2080.

Before BAZELON, McGOWAN and WILKEY, Circuit Judges.

Opinion for the Court filed by WILKEY, Circuit Judge.

Dissenting opinion filed by BAZELON, Circuit Judge.

OUTLINE OF THE OPINION

*Alaska Bulk Carriers* v. *Kreps, et al.*

| | | Page |
|---|---|---|
| I. | BACKGROUND | 817 |
| | A. Statutory | 817 |
| | B. Factual | 819 |
| II. | THE ISSUE | 821 |
| III. | ANALYSIS OF SECTION 506 OF THE MERCHANT MARINE ACT OF 1936 | 822 |
| | A. The Language of Section 506 | 822 |
| | 1. Exclusion of Other Exceptions | 822 |
| | 2. Findings of Need as Essential Basis for Limited Waiver | 823 |
| | B. Legislative History of Section 506 | 824 |
| | 1. The Original 1936 Act | 824 |
| | 2. 1938 Amendments | 827 |
| | C. Administrative Interpretation | 829 |
| IV. | SECTIONS OF THE MERCHANT MARINE ACT OF 1936 RELIED UPON BY THE AGENCY AND THE TRIAL COURT AS SOURCES OF AGENCY AUTHORITY | 833 |
| | A. Section 504, Title V, of the Merchant Marine Act of 1936 (46 U.S.C. § 1154) | 834 |
| | B. Section 207, Title V, of the Merchant Marine Act of 1936 (46 U.S.C. § 1117) | 835 |
| | C. Section 1104 (a), Title XI, of the Merchant Marine Act of 1936 (46 U.S.C. § 1274 (a)(3)) | 836 |
| V. | POLICY OF THE MERCHANT MARINE ACT OF 1936 | 839 |
| | *Conclusion* | 840 |

WILKEY, Circuit Judge:

█ This is an appeal from an unsuccessful challenge in the District Court by appellant-plaintiffs to action taken collectively by the Secretary of Commerce, the Maritime Administrator, and the Maritime Subsidy Board. The Agency (to use the term inclusive of the actions and authority of all appellee-defendants) had removed statutory restrictions barring operations of the 225,000-ton tanker *Stuyvesant* in the domestic maritime trade in exchange for the repayment (by 20-year promissory notes) of the entire $27.2 million subsidy the Agency had previously paid toward construction of the *Stuyvesant.* We hold that nothing in the Merchant Marine Act of 1936 [1] permits the *permanent* removal of the statutory bar to the utilization of construction-subsidized vessels in the domestic maritime trade, and therefore reverse the decision of the District Court.

## I. BACKGROUND

### A. *Statutory*

It has been recognized that the cost of building ships in U.S. shipyards, and likewise the cost of operating vessels with American crews and according to American safety standards, is considerably higher than construction in foreign shipyards or operation with foreign crews. It has also long been recognized that an adequate merchant marine is vital to both the national defense and the commercial welfare of the United States.[2] Since the earliest days of

1. Pub.L.No.74–835, ch. 858, 49 Stat. 1985 (29 June 1936), as amended, 46 U.S.C. § 1101 *et seq.* (1970).

2. *See Sea-Land Service, Inc. v. Kreps,* 566 F.2d 763, 765 (D.C. Cir. 1977); Merchant Marine Act of 1936, 46 U.S.C. § 1101 (preamble); Note, *Approval of Operating-Differential Subsidies Under Section 605(c) of the Merchant Marine Act of 1936: A New Standard for "Adequacy,"* [1978] DUKE L.J. 252.

the Republic, the problem of maintaining an adequate merchant marine in the domestic trade has been solved by preferential legislation that only U.S.-built and U.S.-flag vessels can be operated in commerce between points in the United States.[3] The Jones Act, § 27 of the Merchant Marine Act of 1920,[4] provides that only vessels "built in and documented under the laws of the United States and owned by persons who are citizens of the United States" may engage in domestic trade, defined as trade "between points in the United States, including Districts, Territories, and possessions thereof embraced within coastwise laws . . . ."[5] Since all ships operating in the U.S. domestic trade are both U.S.-built and owned, there has thus never been a need for a subsidy.

In U.S. foreign commerce, however, the practical competitive situation is otherwise. Every foreign nation with which the United States trades has precisely the same interests and precisely the same right to have cargo passing between the two countries carried in ships of its flag. If the construction and operating costs of the foreign-flag vessels are lower, which they are and have been for many years, then on a purely competitive basis both import and export cargo of the United States will be carried exclusively in foreign-flag vessels. To forestall this highly undesirable situation, Congress for many years has authorized both a subsidy for ships to be built in U.S. yards and an operating-differential subsidy for the manning of American-flag vessels by American citizens in accordance with American safety standards. Under the construction-differential subsidy program,[6] which is the only subsidy at issue here, the Government may pay up to 50% of the construction costs of vessels needed for the U.S. foreign maritime trade.[7]

The U.S. merchant fleet is thus divided into two distinct segments. The "Jones Act" fleet, which operates in the protected U.S. domestic trade, cannot economically compete in foreign trade with either foreign ships or the U.S. subsidized fleet, because Jones Act ships are built and operated without subsidy and are thus far more costly to their American owners. The subsidized U.S. merchant fleet has never been allowed to compete in the domestic trade, because it would be grossly unfair to allow U.S. vessels which have received a subsidy of up to 50% of construction costs to compete with U.S. vessels whose owners paid the full costs of construction in U.S. yards. The Jones Act preference legislation, designed to encourage construction in U.S. shipyards and the employment of U.S.-flag vessels in the domestic trade, all without direct cost to the taxpayers, would be completely negated if subsidized U.S.-flag competition were allowed to invade this protected reserve. As a consequence of such competition, American shipowners would be reluctant to build vessels without subsidy and the long-range investment decision-making of American shipowners and shipbuilders would be seriously upset.[8]

The appellants argue that "[u]ntil the agency actions complained of here, ships built in U.S. shipyards for the subsidized fleet were permanently barred from com-

---

3.  *See* Act of 4 July 1789, ch. II, § 5, 1 Stat. 24, 27 (discount on duties for goods imported in vessels owned by U.S. citizens); Act of 20 July 1789, ch. III, 1 Stat. 27 (tax on foreign vessels transporting U.S. products "coastwise" within the United States); Act of 1 March 1817, ch. XXXI, 3 Stat. 351 (direct prohibition of use of foreign vessels in domestic trade).

4.  Pub.L.No.66–261, ch. 250, § 27, 41 Stat. 999 (5 June 1920), 46 U.S.C. § 883 (1970). The term "Jones Act" is perhaps most commonly used to refer to § 33 of the Merchant Marine Act of 1920. *See* 41 Stat. 1007, 46 U.S.C. § 688 (1970). This section provides for recovery for injury to or death of a seaman. *See id.* In this opinion, however, we will use the term "Jones Act" to refer only to § 27 of the Merchant Marine Act of 1920.

5.  *See* Merchant Marine Act of 1920, *supra,* § 27, 46 U.S.C. § 883 (1970).

6.  *See* 46 U.S.C. §§ 1151–61 (1970).

7.  *See* 46 U.S.C. § 1152(b) (1970).

8.  *See* Opening Brief for Appellants Alaska Bulk Carriers, Inc. and Trinidad Corp. at 6–8 [hereinafter cited as Brief for Alaska Bulk and Trinidad].

peting with the Jones Act fleet in the protected domestic trade." [9] Appellants point to § 506 of the Merchant Marine Act of 1936 [10] as providing this statutory barrier. Section 506 provides that the owner of any ship built with construction-differential subsidy must agree that the vessel is to be operated only in foreign trade, except for certain intermediate stops in the United States or its territories as part of world-wide voyages or under temporary waivers granted by the Agency not to exceed six months in any one year. [11] The exact language of § 506 constituting this statutory bar, with two exceptions, is:

> Every owner of a vessel for which a construction-differential subsidy has been paid shall agree that the vessel shall be operated exclusively in foreign trade . . . [or on voyages with intermediate stops as part of world-wide voyages] . . . and that if the vessel is operated in the domestic trade on any of the above-enumerated services, he will pay . . . [a proportional amount of the subsidy]. The Secretary may consent in writing to the temporary transfer of such vessel to service other than the service covered by such agreement for periods not exceeding six months in any year, whenever the Secretary may determine that such transfer is necessary or appropriate to carry out the purposes of this chapter. [Proportional repayment of the subsidy again provided.]

While other sections of the Merchant Marine Act of 1936 are discussed by both sides in this case, § 506 is the centerpiece about which the argument turns, and in our view its proper interpretation is decisive here.

### B. Factual

The *Stuyvesant,* a 225,000 deadweight ton oil tanker, was built at a total allocated cost of $102.7 million by Seatrain Shipbuilding Corporation. [12] The United States Government's contribution to the financing was as follows: [13]

$27.2 million—

> construction-differential subsidy awarded by the Agency in 1972, the equivalent of 26% of the total cost of construction of the *Stuyvesant,* under Title V of the Merchant Marine Act of 1936;

$30.2 million—

> loans guaranteed by the Agency under Title XI of the Act;

$5 million—

> loan by the Economic Development Administration (EDA), another agency of the Department of Commerce, for conversion from military to civilian purposes of the former Brooklyn Naval Yard, which constructed the *Stuyvesant* and other ships for Seatrain Shipbuilding Corporation (Seatrain);

$73.8 million—

> EDA guarantee to the extent of 90% of additional $82 million private loans to

9. *See id.* at 6.

10. 46 U.S.C. § 1156 (1970).

11. *Id.*

12. *See* Brief for the Secretary of Commerce and Other Federal Appellees at 15–16 & n. 11. *Cf.* Affidavit of Robert Brown, Vice President-Finance of Seatrain Lines, Inc., parent company of intervenors Seatrain Shipbuilding Corp. and Polk Tanker Corp., Jt.App. at 256, 262 (approximate $120 million cost of eventual "sale" of *Stuyvesant* to United States Trust Company as owner-trustee for General Electric Credit Corporation) (affidavit dated 25 Sept. 1977) [hereinafter cited as Affidavit of Robert Brown]. Other estimations of the value of costs of construction of the *Stuyvesant* at different times, however, have yielded different figures. *See, e. g.,* letters of James Dawson,

Jr., Secretary of Maritime Administration, to Polk Tanker Company and Queensway Tankers, Jt.App. at 208, 209; 213, 214 (construction costs of $70.2 million and net interest of $5.4 million, yielding figure of "final actual cost of construction" of approximately $75.6 million) [hereinafter cited as letters of James Dawson].

13. *See* Affidavit of Robert Brown, *supra* note 12, Jt.App. at 257–61 (reviewing construction-differential subsidy payment for *Stuyvesant* and loans conferred or guaranteed by Economic Development Administration); letter of Howard Pack, President of Seatrain Lines, Inc., to Robert Blackwell, Assistant Secretary for Maritime Affairs, Jt.App. at 190, 191 (noting debt financing under Title XI) (letter dated 8 July 1977) [hereinafter cited as letter of Howard Pack].

Seatrain Shipbuilding for the purpose of developing and maintaining the Brooklyn Naval Yard.

In accordance with § 506 of the Act, as a condition to receiving the $27.2 million subsidy, Seatrain and Polk Tanker Corporation (Polk), the vessel's purchaser, executed agreements to operate the *Stuyvesant* exclusively in the foreign trade of the United States.[14]

In contrast with two similar vessels constructed by Seatrain Shipbuilding, when the Title V subsidy and the Title XI financing insurance were awarded, the *Stuyvesant* had no firm commitment for employment in the foreign trade. Unfortunately, on its completion in 1977, there were still no prospects for the *Stuyvesant* in foreign commerce.[15] As the *Stuyvesant's* owners looked about for her gainful employment, they observed the changed situation in the carriage of Alaska oil. Contrary to original expectations, Alaska crude was not being carried from Valdez on relatively short hauls to U.S. West Coast ports, but because of the glut of oil in the West was being hauled around Cape Horn to the Eastern

United States and the Caribbean. Furthermore, the world tanker tonnage over-supply had little effect on this trade, because this trade by U.S. maritime laws was largely confined to American-flag vessels.[16]

There was, however, one obvious obstacle: while the *Stuyvesant* was American-built, it was also constructed by subsidy and thus was not eligible for employment in the domestic coastwise trade. To overcome this obstacle, in July 1977 the *Stuyvesant* owners applied for a three-year waiver of the § 506 restrictions on employment of the ship in other than the U.S. foreign trade, invoking the general contract-making authority of the Secretary of Commerce under § 207 of the Merchant Marine Act of 1936.[17] The present plaintiff-appellants and others intervened before the Agency, pointing out that § 506 of the Merchant Marine Act specifically provided only for a six-month waiver and that there was no legal authority for a three-year waiver. In response to these objections, the *Stuyvesant* owners (intervening defendants here) withdrew their application.[18]

14. *See* Construction-Differential Subsidy Contract MA/MSB–164 between the Maritime Subsidy Board and Seatrain Shipbuilding Corp., Jt.App. at 112, 114 (subsidy conferred to aid construction of vessel "to be used in the foreign commerce of the United States") (preamble) (contract signed 30 June 1972); Contract between the Maritime Subsidy Board and Polk Tanker Corporation, Contract MA/MSB–165, Article 9(b)(i), Jt.App. at 160, 177 (purchaser agrees that vessel "shall be operated exclusively in foreign trade . . . .") (contract signed 30 June 1972).

15. *See* Affidavit of Robert Brown, *supra* note 12, Jt.App. at 257–60 (severe downturn in demand for crude oil tankers in 1975 forced cessation of construction of *Stuyvesant,* as well as of tanker *Bay Ridge;* construction of *Stuyvesant* recommenced upon agreement by Standard Oil Company of Ohio (SOHIO) to charter vessel for three years of use in coastal "domestic" trade); Brief for Appellees-Cross Appellants Seatrain Shipbuilding Corporation and Polk Tanker Corporation at 8 (no business available for *Stuyvesant* in foreign commerce; SOHIO domestic charter the only option) [hereinafter cited as Brief for Seatrain and Polk Tankers].

16. *See generally* Affidavit of Charles Dunagan, Shell Oil Company, Jt.App. at 282, 283–86 (comparing projected demand for tankers in

the domestic Alaskan oil trade with available unsubsidized tanker supply) (affidavit of 12 October 1977); Affidavit of John Ervin, President of Trinidad Corporation, Jt.App. at 493, 496 (projected U.S. coastal trade is only viable market for unsubsidized domestic vessels) (affidavit of 21 September 1977).

17. 46 U.S.C. § 1117 (1970) (authority to "enter into such contracts . . . as may . . . be necessary . . . to protect, preserve, or improve the collateral held by the [Federal Maritime] Commission . . . to secure indebtedness . . . ."). *See* letter of Howard Pack, *supra* note 13, Jt.App. at 190, 193–202 (application for three-year waiver, urging resolution of possible conflict between sections 207 and 506 of Merchant Marine Act of 1936, 46 U.S.C. §§ 1117 & 1156 (1970) in favor of section 207).

18. *See* letter of Steve Russell, Polk Tanker Corporation, *to* Robert Blackwell, Assistant Secretary for Maritime Affairs, Jt.App. at 207 (withdrawing three-year waiver request) (letter dated 26 August 1977); Affidavit of Robert Brown, *supra* note 12, Jt.App. at 260 (application of Polk to Maritime Administration for three-year waiver withdrawn because of "numerous protests" against application).

There followed a series of *ex parte* meetings between the Agency and Seatrain and Polk.[19] On 25 August 1977 Polk presented a new offer to the Agency, which would permit the *Stuyvesant* to operate in the Alaskan or any other domestic trade. The offer also provided that the Agency release the restrictions required by the statute and embodied in the subsidy contract upon Polk's execution of a twenty-year promissory note payable in 40 semiannual installments as reimbursement of the amount of the subsidy and other monies advanced by the Government.[20] This letter application was not published in the Federal Register, but the Agency by two letters of 31 August 1977 to Polk and Queensway Tankers, Inc. (the proposed operator of the *Stuyvesant*) approved the application to waive the restrictions *permanently* as well as various other features of the complicated refinancing necessary.[21]

On 22 September 1977, appellants filed this action in the District Court, one day prior to the scheduled closing of the entire transaction. A temporary restraining order was granted, ultimately preliminary injunction was denied, and the transaction was consummated on 30 September 1977. After extensive discovery, cross-motions for summary judgment on the merits were filed, and the District Court ruled for the defendants on the principal issue of the Agency's authority to waive permanently the restrictions on employment of the *Stuyvesant* in the U.S. domestic maritime trade.[22]

## II. THE ISSUE

■ We regard the issue as one of straightforward statutory interpretation, primarily of § 506, and, to whatever extent relevant, of other sections of the Merchant Marine Act of 1936.

The trial court phrased the first of his stated four legal issues as:

> [W]hether the Secretary has the legal authority under the Merchant Marine Act of 1936 to remove domestic trading restrictions upon the operation of a vessel built with . . . [construction-differential subsidy] in exchange for repayment in full of the . . . [construction-differential subsidy] . . . .[23]

The trial court found no explicit authority for the Agency action challenged here, either in § 506 or any other part of the Act, but held that there must be inherent Agency power after subsidy repayment to waive permanently the § 506 bar on a vessel's operation in the U.S. domestic trade. Our analysis is to the contrary: a proper construction of § 506 shows that the statute implicitly bars such waiver, the legislative history of § 506 supports this, and no other statutory provision either explicitly or implicitly gives rise to the authority asserted by the Agency here.

19. *See* Brief for Alaska Bulk and Trinidad, *supra* note 8, at 10.

20. *See* Affidavit of Robert Brown, *supra* note 12, Jt.App. at 260–61 (Polk offer to repay construction-differential subsidy in return for removal of domestic use restrictions); letter of Steve Russell, Polk Tanker Corporation, to James Dawson, Secretary of Maritime Administration, Jt.App. at 203 (formal application for removal of use restrictions and providing terms of subsidy repayment).

21. *See* letters of James Dawson, *supra* note 12, Jt.App. at 208, 213 (outlining steps toward financing of *Stuyvesant*); letters of James Dawson to Polk Tanker Corporation, Jt.App. at 72–75 (permanently removing use restrictions on vessel to permit shipping of "Alaskan oil to the lower 48 states") (letter dated 31 August 1977). Because of the disposition we make of one issue we consider critical to this case, an examination of the other financing measures is not needed here. These measures are described in detail in the District Court's opinion. *See Shell Oil Co. v. Kreps, et al.,* 445 F.Supp. 1128, 1132–33 (D.D.C.1977).

22. *See Shell Oil Co. v. Kreps et al., supra,* 445 F.Supp. at 1138. Though the District Court decided other issues, such as the need to remand to the Agency for a determination of the competitive effect of the *Stuyvesant's* entry into domestic trade, *see id.* at 1140–44, none of these issues is relevant to the question which we find to be dispositive of this case.

23. *See id.* at 1131. Since we reach a result opposite from that of the District Court on this issue, we do not find it necessary to reach the other three legal issues posited by the District Court.

## III. ANALYSIS OF SECTION 506 OF THE MERCHANT MARINE ACT OF 1936

### A. *The Language of Section 506*

The initial clause of § 506 is rather explicit: [24]

> Every owner of a vessel for which a construction-differential subsidy has been paid shall agree that the vessel shall be operated exclusively in foreign trade . . . .

Recalling our discussion above, the purpose of this clause is obvious: a construction-differential subsidy is only to make American-built vessels competitive with foreign-flag vessels in the foreign trade; there is no need or purpose to make subsidized vessels competitive in the U.S. domestic trade, because these vessels are exclusively built in American shipyards without subsidy. To put subsidized vessels into that trade would be unfair to owners who have built and purchased without Government subsidy, and ultimately would eliminate unsubsidized U.S. shipbuilding. Section 506, therefore, is *the clause* in the Merchant Marine Act which separates the two fleets, *i. e.,* the Jones Act domestic trade fleet (unsubsidized), and the U.S. foreign trade fleet (subsidized).

The statutory language is strong: "Every owner . . . shall agree." [25] It is not just the original builder or first purchaser, but every owner during the life of the vessel who must agree to the restriction. [26] The restriction is "that the vessel shall be operated exclusively in foreign trade," for the obvious purpose aforementioned. The restrictive language also refers to a subsidy which "has been paid." The idea is one of permanence; once the ship has been constructed by Government assistance of up to 50% of its original construction cost, the ship is dedicated to the U.S. foreign trade. Payment of the subsidy stamps indelibly the character of the ship then and thereafter.

### 1. *Exclusion of Other Exceptions*

■ Section 506 not only mandates the owner's obligation to operate the vessel exclusively in U.S. foreign trade, but it provides the only exceptions to that obligation to be found in the Merchant Marine Act. These exceptions are, first, that certain intermediary stops may be made in the course of long voyages in foreign trade, [27] where the American vessel naturally would touch at more than one American port and it would be uneconomic to forbid the vessel to carry cargo between such American ports. Second, the Agency may consent to the *temporary* operation of a subsidized vessel in U.S. domestic maritime trade for a period not to exceed six months in any one year if such operation is deemed "necessary or appropriate to carry out the purposes" of the Act. [28] If either exception is invoked, the owner must pay back that part of the construction subsidy proportional to the period of the exception. [29]

In the entire Merchant Marine Act, only § 506 explicitly does these three things:

(1) mandates the vessel's exclusive operation in the U.S. foreign trade;

(2) provides two exceptions to such exclusive foreign trade operation; and

(3) authorizes the Agency to accept payback of subsidy for vessels to operate in the domestic trade.

The obligation of exclusive operation is clear, the two exceptions are precise and limited, and the financial consequences of

---

24. 46 U.S.C. § 1156 (1970).

25. *Id.*

26. Further, in the present case, a restriction on use of the *Stuyvesant* applicable to all future owners is written into the construction-differential subsidy contract itself. *See* Contract between the Maritime Subsidy Board and Polk Tanker Corporation, Contract MA/MSB–165, Article 9(d), Jt.App. at 160, 178 ("The foregoing provisions [which require the purchaser to operate the vessel exclusively in foreign trade] shall run with the title to the Vessel and be binding on all owners thereof.").

27. 46 U.S.C. § 1156 (1970).

28. *Id.*

29. *Id.*

invoking the exceptions are equally precise and clear.

■ Since these provisions are so clear on the face of the statute, we are puzzled by the trial judge's statement that ". . . *nothing* in section 506 . . . either expressly or implicitly addresses the issue of *permanent* revocation of a . . . [construction-differential subsidy] contract." [30] By the usual canons of statutory construction, we think the issue of *permanent* revocation of a construction-differential subsidy contract *is* addressed implicitly by the specific enumeration of the permissible exceptions to the vessel's permanent dedication to U.S. foreign trade. Where a statutory mandate is laid down, followed by specifically enumerated exceptions to such mandate, and where neither this mandate nor exceptions thereto are found anywhere else in the same statute, we think that the unquestioned canon of statutory construction is that the enumerated exceptions are *exclusive*, and that any other exception (here, permanent waiver or revocation of vessel use restrictions) is ruled out implicitly.[31]

2. *Findings of Need as Essential Basis for Limited Waiver*

■ That § 506 implicitly forbids the *permanent* lifting of the bar to employment of the subsidized vessel in the domestic trade is borne out by examination of the procedure for implementing the limited waiver which *is* authorized by § 506. On inquiry

by the court at oral argument as to what finding the Secretary would need to make under § 506 to justify consent to place the subsidized vessel for six months in the domestic trade, counsel for the Agency promptly replied, ". . . what the need . . . [for vessels] will be in the foreseeable future . . . ." [32] It was then observed that § 506 requires a partial return of the subsidy proportional to the limited term the vessel is permitted in the domestic trade, and therefore a complete return of subsidy might be thought consistent with a permanent lifting of the barrier against employment in the domestic trade, if such permanent waiver were authorized. Continuing with the analysis, the question then arises, what finding should the Secretary make as a basis for consent to the *permanent* waiver of the restriction? To this Government counsel responded that prediction of need for a vessel "would be really . . . impossible to make over 25 years. The Secretary can only predict what the needs will be . . . [for] about three years." [33]

Thus the analysis of the Government will not stand up. Where a waiver for a limited period is involved, it is rational to believe that the Secretary can make a finding of need for the vessel for a limited period of time, since Government agencies and private businesses frequently make economic judgments for a period of six months. In the case at bar, the determination by the

30. *Shell Oil Co. v. Kreps et al., supra,* 445 F.Supp. at 1135 (emphasis of the District Court).

31. *See, e. g., National Railroad Passenger Corp. v. Nat'l Ass'n of Railroad Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974), *reh. denied,* 415 U.S. 952, 94 S.Ct. 1478, 39 L.Ed.2d 568 (1974). *Continental Casualty Co. v. United States,* 314 U.S. 527, 533, 62 S.Ct. 393, 86 L.Ed. 426 (1942); *Saxon v. Georgia Ass'n of Independent Insurance Agents, Inc.,* 399 F.2d 1010, 1013–14 (5th Cir. 1968); *Gotkin v. Miller,* 379 F.Supp. 859, 865 (E.D.N.Y.1974), aff'd, 514 F.2d 125 (2d Cir. 1975); *Herzberg v. Finch,* 321 F.Supp. 1367, 1369 (S.D.N.Y.1971).

32. Statement of Michael Kimmel, representing the Secretary of Commerce, 16 October 1978.
This response of counsel is supported by the criteria for granting a six-month waiver to the

prohibition of domestic use of subsidized vessels set forth in the Federal Regulations. In a final agency rule with effective date of 30 June 1977, the Maritime Administration provided that the owner or charterer of a tank vessel in applying for such a waiver must disclose for agency consideration "[a]ll available information to support the applicant's assertion that suitable vessels of a competitor would not be available for the prospective voyage or voyages." In addition, the rule provides that consideration will be made by the Administration of all timely protests to the waiver request received from prospective competitors. *See* 46 CFR Ch. II, Part 250, subsections 250.3 & 250.4, *reprinted in* 42 Fed.Reg. 33035–36 (1977).

33. *See* Statement of Michael Kimmel, *supra* note 32.

Secretary of the need for the *Stuyvesant,* and the noncompetitive effect of the *Stuyvesant's* entry into the Alaska oil trade, was made for a limited period. However, a finding of need and no competitive effect resulting from the entry of a subsidized vessel into the entire U.S. domestic trade for the permanent life of the vessel—a period in excess of 25 years—is a finding impossible to make. No Government agency or private enterprise can logically make a finding of need for this or any other vessel for its entire life.[34]

If it is logically possible to make a finding of need and noncompetitive effect for a limited period of six months, or perhaps even three years, then lifting the restrictions for that limited period has a logical basis. If it is logically impossible to make a finding of need or noncompetitive effect on a permanent basis, for the entire life of this new vessel, *then it is logically impossible to make the only finding which will sustain rationally the waiving of the restriction against the employment of the subsidized*

*vessel in the domestic trade.* For a limited period the finding to sustain the waiver can be made; for an unlimited period the finding to sustain the waiver cannot be made; therefore, the waiver for a permanent period cannot be made.

### B. *Legislative History of Section 506*

We think that § 506 properly analyzed forbids by implication the grant of the permanent waiver by the Agency here. The trial court asserted that *"nothing* in section 506 . . . or in the legislative history of these provisions either expressly or implicitly addresses the issue of *permanent* revocation of a . . . [construction-differential subsidy] contract." [35] Since we do, however, find support in the legislative history for the statutory interpretation set forth above, we will discuss briefly the legislative history as we have found it.

### 1. *The Original 1936 Act*

Prior to the enactment of the Merchant Marine Act of 1936, the question of possible

---

**34.** This assessment was apparently shared by the Maritime Subsidy Board, Maritime Administration, and Department of Commerce (collectively, the Agency) in the Agency's Final Opinion and Order on Remand for Reconsideration from the District Court's earlier opinion. *See T. T. Stuyvesant—Repayment of CDS Operation in Jones Act Trade,* MSB Docket No. A–124 (6 Jan. 1978) [hereinafter cited as *T. T. Stuyvesant—Repayment of CDS*], Jt.App. at 590, on remand from the District Court's opinion in *Shell Oil Co. v. Kreps et al., supra.* On the issue of the likely competitive effect of a permanent waiver of the *Stuyvesant's* use restrictions, an issue which the District Court found had been afforded inadequate consideration by the Agency, *see id.* at 1140–43, the Agency found that an "assessment of [future] supply and demand" for tankers in the Alaska oil trade is "based on a number of variables that might change." *T. T. Stuyvesant—Repayment of CDS, supra,* Jt.App. at 610. These variables include the degree of foreign flag-ship carriage of Alaskan oil to the Virgin Islands, *see American Maritime Association v. Blumenthal,* 192 U.S.App.D.C. 40, 590 F.2d 1156 (1978) (foreign-flag vessels not barred by Jones Act from carrying Alaskan oil to Virgin Islands and then carrying products refined from that oil to mainland from Virgin Islands); need for tankers in Soviet grain programs; the possibility of reduced cargo deadweight passage of large vessels through the Panama Canal; the effect of implementation of more stringent U.S. Coast

Guard pollution control regulations; and the possibility of increased mainland production. *See T. T. Stuyvesant—Repayment of CDS, supra,* Jt.App. at 610–11. As a result of these and other "uncertainties," the Agency on remand *in early 1978* found that it was "difficult or impossible to predict the supply and demand of tankers in the Alaska oil trade *beyond 1980.* . . ." *See id.* at 611 (emphasis added). Despite these findings, the Agency aimed to bolster its decision to waive permanently the use restrictions of the *Stuyvesant* by concluding that "there is no substantial basis known on which to conclude that . . . [permanent waiver of use restrictions on the *Stuyvesant* would bring about] any unfair competition through displacement of any unsubsidized vessels that may be in . . . [the Alaska oil] trade in the future." *Id.* We would conclude just the opposite: That because of numerous uncertainties involved in both the global and domestic oil trade, and consequently in the demand for vessels to carry that oil, there is no rational basis on which a finding of need can be made for a vessel in a particular trade for that vessel's life—a period *much longer* than the three-year limit to estimation of future need set by the Agency.

**35.** *See Shell Oil Co. v. Kreps et al., supra,* 445 F.Supp. at 1135 (emphasis of the District Court).

permanent release from the restriction against the employment of subsidized vessels in the U.S. domestic trade was discussed. Some original proponents of the 1936 Act urged inclusion of a provision allowing such release; others did not. All in all, some fifteen versions of the finally enacted Merchant Marine Act of 1936 were considered.[36] A number of drafts of the eventual § 506 which were before the Congress in 1935 and 1936 provided for time-unlimited waivers conditioned upon repayment of subsidy.[37] For example, the bill that first passed the House in 1935, but failed to win approval in the Senate, allowed a vessel constructed with the aid of Government subsidy to operate in the domestic trade, if the owner received the "written consent of the . . . [Agency] so to operate" and repaid to the United States that amount of the construction subsidy proportional to the "remaining economic life of the vessel."[38] Since the prior experience of Congress with construction subsidies had shown that the domestic operation of ships constructed under subsidy could disadvantage the unsubsidized Jones Act fleet,[39] later drafts reported to the Senate restricted the Agency's authority to lift the restriction against domestic trading. For example, one draft considered by the Senate in 1936 permitted permanent waivers, *but* provided that the Agency could not grant any waiver transferring a subsidy-

built vessel to the domestic fleet "except to replace a vessel engaged in such trade, or unless there are not available vessels to serve adequately the needs of commerce" in a particular domestic service "in which it is proposed to operate such vessel." [40]

The drafting and redrafting process, with numerous conflicting versions of the Merchant Marine bill appearing and disappearing, understandably introduced certain confusions and conflicting passages in the ultimate legislation. The final Act [41] included visible traces of individual legislators' conflicting desires which produced a § 506 that, although ambiguous, could have been construed to mean that permanent release could be granted by the Agency on repayment of that part of the subsidy proportional to the remaining life of the vessel.

As originally enacted in 1936, § 506 read: [42]

It shall be unlawful to operate any vessel, for the construction of which any subsidy has been paid pursuant to this title, other than exclusively in foreign trade, or on a round-the-world voyage or a round voyage from the west coast of the United States to a European port or ports or a round voyage from the Atlantic coast to the Orient which includes intercoastal ports of the United States, or on a voyage in foreign trade on which the

---

36. *See, e. g.,* H.R. 8555, 74th Cong., 1st Sess. § 507 (introduced in the Senate 13 May 1935, reported with an amendment, 29 July 1935); S. 3500, 74th Cong., 2d Sess. § 506 (introduced in the Senate 6 January 1936); S. 3500, 74th Cong., 2d Sess. § 506 (introduced in the Senate 24 February 1936); S. 4110, 74th Cong., 2d Sess. § 27 (introduced in the Senate 24 February 1936); H.R. 8555, 74th Cong., 2d Sess. § 506 (introduced in the Senate 24 April 1936).

37. *See, e. g.,* H.R. 7521, 74th Cong., 1st Sess. § 504 (1935) (introduced by Judge Bland, Chairman of House Committee on Merchant Marine and Fisheries); S. 2582, 74th Cong., 1st Sess. § 504 (1935) (introduced by Sen. Copeland, Chairman of Senate Commerce Committee).

38. *See* H.R. 8555, 74th Cong., 1st Sess. § 507(b), passed by the House 27 June 1935. *See also* H.R.Rep.No.1277, 74th Cong., 1st Sess. 22 (1935) (report of House Committee on Merchant Marine and Fisheries, to accompany

1935 version of H.R. 8555, not passed by the Senate) ("The . . . [Agency] may, on certain conditions, consent to the operation of . . . a [subsidized] vessel in the domestic trade in which case . . . [a proportional] amount of the subsidy shall be repaid . . .").

39. *See* S.Rep.No.898, 74th Cong., 1st Sess. 14–15 (1935) (intercoastal mail delivery by subsidized American vessels works to disadvantage of unsubsidized American competitors and to American merchant marine).

40. S. 3500, 74th Cong., 2d Sess. § 506(c) (introduced in the Senate 6 Jan. 1936).

41. *See* Pub.L.No.74–835, ch. 858, 49 Stat. 1985 (29 June 1936), now amended, 46 U.S.C. § 1101 *et seq.* (1970).

42. *See id.,* 49 Stat. 1999 (emphasis added).

vessel may stop at an island possession or island territory of the United States, *unless the owner of such vessel shall receive the written consent of the Commission so to operate and prior to such operation shall agree to pay to the Commission, upon such terms and conditions as the Commission may prescribe, an amount which bears the same proportion to the construction subsidy theretofore paid or agreed to be paid (excluding cost of national-defense features as hereinbefore provided), as the remaining economic life of the vessel bears to its entire economic life.* If an emergency arises which, in the opinion of the Commission, warrants the temporary transfer of a vessel, for the construction of which any subsidy has been paid pursuant to this title, to service other than exclusive operation in foreign trade, the Commission may permit such transfer: *Provided,* That no operating differential subsidy shall be paid during the duration of such temporary or emergency period, and such period shall not exceed three months. . . .

The ambiguities of the language above are apparent. Although the non-italicized first half of the long first sentence of the 1936 version generally prohibited domestic operation of a subsidized vessel, the italicized second half of that sentence arguably

created a general exception to that prohibition. That exception was conditioned only upon "written consent of the Commission" and agreement by the shipowner to repay to the Commission an amount of subsidy proportional to the "remaining economic life of the vessel." This exception was not expressly confined to any particular economic conditions or to any type or duration of voyage. The second sentence of the section dealt with temporary transfers of a subsidized vessel to domestic service at times of "emergency," and could be read not to limit the much broader exception to the prohibition provided in the first sentence. It was thus possible to read the 1936 version of § 506 as authorizing both (1) an unlimited waiver (despite the absence of specific reference to such a waiver), conditioned only upon approval of the Commission and the shipowner's agreement to repay a portion of the subsidy; and (2) a temporary waiver allowable for a period of three months, and only in the case of national emergency.[43]

On the other hand, the second sentence of § 506 as passed in 1936 could also be read as qualifying the first sentence, so as to disallow permanent waivers in favor of waivers allowable for periods of no more than three months in the event of an "emergency."[44] Regardless of one's reading of the language

---

**43.** This interpretation is supported by commentary inserted in the record of Senate Hearings by Senator Guffey, sponsor of S. 4110, 74th Cong., 2d Sess. (1936), concerning two of the three bills that formed the basis of the committee print eventually passed by the Senate in 1936 and later also by the House, as the Merchant Marine Act of 1936. *See Merchant Marine Act, 1936: Hearings Before the Committee on Commerce of the United States Senate,* 74th Cong., 2d Sess. 121, 124 (1936) (comment on S. 3500, bill introduced by Sen. Copeland and altered in committee print 3 March 1936) ("Section 506(b) . . . states that, *except as later provided,* no vessel on which a subsidy has been paid shall be operated in other than foreign trade *unless the unamortized construction differential is repaid to the [Agency].* . . ."") (emphasis added); *id.* at 133 (comment on S. 4110, bill introduced by Senator Guffey) ("Provision is made . . . for the transfer of . . . [a subsidized] vessel from a foreign service to the intercoastal service if in the opinion of the Commission the conditions

warrant such transfer, provided that the owner will immediately pay to the Commission the unamortized portion of said subsidy.").

**44.** Though this reading of the language seems less plausible to this court than the earlier one, and is urged by none of the parties to this case as the correct reading of the statute in force in 1936, the Chairman of the U.S. Maritime Commission in testimony before a House Committee in 1938 premised his proposals for amendments to the section on the fact that the interrelation between the first and second sentences of § 506 was unclear. He proposed an amendment to the section which led to the deletion of all language in the first sentence that appeared to authorize a permanent waiver and which was arguably in conflict with the second sentence, thus removing the very source of the claimed "ambiguity." *See* pp. ——–—— & notes 46–53 of 194 U.S.App.D.C., pp. 827–828 & notes 46–53 of 595 F.2d *infra.*

of § 506 as enacted in 1936, however, it is perhaps most critical to the present case to note that legislative history of the section shows that *the issue of use restriction waivers—whether temporary or permanent, and whether allowed or disallowed—was addressed by that section and nowhere else in the Merchant Marine Act of 1936.* Not a scintilla of legislative comment or debate has come to light which indicates that any other section or provision of the Act provided authority for, or was intended to deal in any way with, the issue of waivers to restrictions imposed by § 506.[45]

### 2. *1938 Amendments*

■ In 1938, comprehensive amendments were passed to the Merchant Marine Act of 1936.[46] With regard to § 506 of the Act, then Maritime Commission Chairman Joseph P. Kennedy stated that the purpose of the proposed amendment was to remove "ambiguities" and "confusions" in the section, described as follows: [47]

The section now provides that the owner can only engage in foreign trade exclusively with certain enumerated excepted services, for which services the owner is required to repay part of the construction-differential subsidy. There are also provisions which appear to give owners the right to engage in services other than the excepted ones, if the Commission consents to such use and the owner repays part of the construction-differential subsidy. *Whether this right is restricted to the cases of emergency and to periods of three months as mentioned in the section, it is difficult to determine.*

When the Maritime Commission Chairman noted that "[it is difficult to determine] [w]hether this right [to engage in non-excepted services] is restricted to . . .," he referred to "the cases of emergency and to periods of three months." He did not specifically mention the other alternative of his "whether," but this could only have been the arguable alternative at the end of the first sentence of § 506 as enacted in 1936, *i. e.,* the ambiguous reference to repayment of subsidy proportional to the economic life of the vessel in return for the lifting of restrictions on the use of that vessel.[48] Thus the Maritime Commission Chairman sought to relieve the ambiguity of whether the section authorized a permanent lifting of use restrictions in return for repayment of subsidy, or merely a temporary waiver on the ground of emergency. The proposed 1938 amendment, which was adopted by both Houses and stands essen-

---

**45.** Appellees, however, have claimed to find such authority in § 207 of the Act. *See* pp. —— –—— & notes 104–10 of 194 U.S.App.D.C., pp. 835–836 & notes 104–10 of 595 F.2d *infra.*

**46.** *See* Act of 23 June 1938, § 18, 52 Stat. 938 (amending § 506).

**47.** *See Amending Merchant Marine Act, 1936: Hearings on H.R. 8352 Before the House Committee on Merchant Marine and Fisheries,* 75th Cong., 2d & 3d Sess. 8 (1937–38) (emphasis added) [hereinafter cited as *House Hearings on 1938 Amendments*].

Appellants have appropriately pointed out, *see* Brief for Appellant Shell Oil Co. at 33–34, that the Commission Chairman's interpretation of the Amendments proposed in 1938 and of the reasons for their proposal are entitled to carry weight, since the Chairman headed the agency that administered the Act at the time of the Amendments, *see Zemel v. Rusk,* 381 U.S. 1, 11, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965), *reh. denied,* 382 U.S. 873, 86 S.Ct. 17, 15 L.Ed.2d 114 (1965); *Udall v. Tallman,* 380 U.S. 1, 16, 85

S.Ct. 792, 13 L.Ed.2d 616 (1965) *reh. denied,* 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed. 265 (1965), and the Chairman played an active role in drafting the legislation and obtaining its passage, *see Zuber v. Allen,* 396 U.S. 168, 192–93, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969) (departmental construction of its enabling legislation carries most weight when administrators participated in drafting and made known their views before Congress in hearings). Furthermore, the Chairman's views as stated in hearings were accepted almost verbatim into the reports of both of the committees of Congress responsible for acting on the Amendments, *see* p. —— of 194 U.S.App.D.C. & note 52, p. 828 & note 52 of 595 F.2d *infra,* and we find that the Chairman's interpretation of the meaning and purpose of the Amendments is the most plausible one in light of the language of the Amendments themselves, *see* p. —— of 194 U.S.App. D.C., p. 828 of 595 F.2d *infra.*

**48.** *See* p. —— of 194 U.S.App.D.C., p. 826 of 595 F.2d *supra.*

tially unchanged as the present § 506,[49] resolved the ambiguity by eliminating all of the language in the original section that established the arguable exception to that section's general prohibition of domestic use, *i. e.* the clause that begins, "unless the owner [shall receive consent] . . . ."[50] Thus the amendment removed the only language that could be interpreted to authorize a permanent waiver, and substituted therefor a clause requiring repayment of subsidy proportional to the gross revenue derived from the domestic leg of a foreign voyage.

The Maritime Commission Chairman described the effect of these changes as follows: [51]

> If the owner desires to engage in domestic trades other than . . . [domestic portions of world voyages], he can do so only by receiving the consent of the Commission. *The consent for this service*

*is limited to 6 months in any one year. . . . [T]he section as rewritten will result in improved administration and will protect the interests of the Government and those of the carriers, both foreign and domestic.*

This explanation by the Commission Chairman was incorporated almost verbatim into both the Senate and House reports which accompanied the bill amending § 506 in 1938,[52] thus demonstrating irrefutably that Congress intended in 1938 to allow only temporary waivers, with duration of no more than six months.[53]

Thus it does not now matter whether some of the sponsors of the 1936 Act believed that language in the statute authorized a permanent lifting of restrictions in return for repayment of the full subsidy, because the action of the Congress in 1938 resolved the ambiguity by removing from

---

**49.** *See* 46 U.S.C. § 1156 (1970), *reprinted* at p. —— of 194 U.S.App.D.C., p. 819 of 595 F.2d *supra.*

**50.** *See* language of § 506 in original 1936 Act, *reprinted* at pp. ——–—— of 194 U.S.App.D.C., pp. 825–826 of 595 F.2d *supra.*

**51.** *See House Hearings on 1938 Amendments, supra* note 47, at 8–9.

**52.** The Senate Commerce Committee, *see* S.Rep.No.1618, 75th Cong., 3d Sess. 12–13 (1938), stated (emphasis added):

> Section 506 has been entirely rewritten to remove ambiguities and confusion. . . . The section now makes it unlawful for the owner of any vessel on which a construction-differential subsidy has been paid to operate it, without the written consent of the Commission, other than exclusively in foreign trade. . . . The section further provides . . . that in the event the owner operates a vessel on which a construction-differential subsidy has been paid in services other than those which are not unlawful, he shall repay to the Commission a prescribed portion of the . . . subsidy. It is very difficult to determine whether or not these instances in which repayment is required are restricted to the cases of emergency and to periods of 3 months. . . .
>
> As the section is rewritten, it is . . . provided that *the Commission may consent in writing to the temporary transfer of . . . a vessel to services other than those enumerated for periods not exceeding 6 months in any year* whenever the Commission may determine that such transfer is necessary.

Similarly, the House Committee on Merchant Marine and Fisheries, *see* H.R.Rep.No.2168, 75th Cong., 3d Sess. 21 (1938), stated (emphasis added):

> Section 506 . . . has been entirely rewritten in order to remove ambiguities arising from the method of describing the services other than foreign. *As rewritten the section clearly sets forth the obligation of the owner to use the vessel in foreign trade. . . .* No fundamental change in the original purpose of the section has been effected.

Appellees have suggested that the House Committee, in noting that "no fundamental change in the original purpose of the section has been effected" by the 1938 Amendment, must have intended that any authorization that existed in the 1936 Act for permanent waivers must have been carried through with the 1938 Amendments. *See* Brief for Seatrain and Polk Tankers, *supra* note 15, at 31. As we noted earlier, however, the most fundamental purpose of § 506, as generally of the Merchant Marine Act of 1936, was to provide subsidies to allow the American merchant marine to compete in foreign trade, and to separate the subsidized American fleet from the unsubsidized "Jones Act" fleet. *See* pp. ——–—— of 194 U.S.App.D.C., pp. 818–819 of 595 F.2d *supra.* It was undoubtedly this "original purpose" of Section 506, and of other sections of the Act, to which the House Committee referred in its report.

**53.** *See* p. —— of 194 U.S.App.D.C., p. 829 of 595 F.2d *infra.*

§ 506 the only language which could be interpreted to authorize more than a temporary waiver of the restriction against employment in the domestic trade. In 1938 the intention of Congress was unmistakably manifested: to eliminate the only statutory language which could arguably have authorized the permanent waiver of the domestic trading restriction upon repayment of subsidy, and to limit the waiver of the domestic trading restriction to six months in any one year, with no discretion in the Secretary to authorize a longer period.

No one in the present case, however, now contends that § 506, as amended, authorizes permanent waivers. The trial court specifically so stated,[54] and looked elsewhere in the statute for inherent authority in the Secretary to do this.[55] However, the 1936 version of § 506 is the *only* provision which any party to this case has ever cited as providing direct authority for permanent waivers. That language is now *gone,* by specific direction of Congress. We cannot believe that by deleting the only language in § 506 which could be argued to permit permanent waivers, and by leaving only language permitting temporary waivers, Congress thereby manifested an intention that the Agency should have *express* authority to issue *temporary* waivers under § 506 and *implied* authority to issue *permanent* waivers, pursuant not to § 506 but to some unexpressed inherent power conferred in other sections of the Merchant Marine Act of 1936.[56]

As we read the legislative history, both permanent and temporary waiver provisions were considered both in 1936 and in 1938 by the Congress, and Congress in 1938 determined, on the recommendation of the Maritime Commission, to permit the Agency to grant only temporary waivers. This deliberate Congressional intent, pursuant to a carefully constructed policy to maintain separate subsidized and unsubsidized fleets, cannot be ignored by the Agency and the courts on some vague notion of inherent power elsewhere, which it now might be convenient to utilize. Contrary to the assertion of the trial court that there was "nothing" in the legislative history of § 506 concerning permanent waivers,[57] and the court's further reference to "this total dearth of guidance from the statutory language and the legislative history,"[58] we find ample legislative history relevant to this question. Legislative history of the 1936 Act is somewhat ambiguous, as was the 1936 statute itself. The legislative history of the 1938 amendment, however, confirms our present interpretation of the statutory language and demonstrates that whatever vestigial authority there was in the original 1936 Act to issue permanent waivers was eliminated by the 1938 amendment.

### C. Administrative Interpretation

■ After remarking, erroneously we hold, on the "total dearth of guidance from the statutory language and the legislative history" of § 506, the trial court thus found a justifiable basis for turning to "other indicia of legislative intent" and "whether the [A]gency's interpretation of the Act 'serves to further the purposes of the legislation . . . .' "[59] The principal Agency interpretation cited by the court is "the Comptroller General's 1964 decision with respect to two . . . ships owned by Grace Line . . . both of which were built under . . . [construction-differential subsidy] contracts . . . ."[60] In

---

**54.** *See Shell Oil Co. v. Kreps et al., supra,* 445 F.Supp. at 1134–35.

**55.** *See id.* at 1134.

**56.** For discussion of these claims of authority found elsewhere in the Act, see pp. ———–—— & notes 104–29 of 194 U.S.App.D.C., pp. 835–839 & notes 104–29 of 595 F.2d *infra.*

**57.** *See Shell Oil Co. v. Kreps et al., supra,* 445 F.Supp. at 1135.

**58.** *See id.*

**59.** *See id.,* citing *Sea-Land Service, Inc. v. Kreps,* 566 F.2d 763, 778 (D.C. Cir. 1977).

**60.** *See Shell Oil Co. v. Kreps et al., supra,* 445 F.Supp. at 1136.

that 1964 decision[61] the Comptroller General advised the Secretary of Commerce, in accord with a legal opinion on the same question issued earlier by the Acting General Counsel to the Maritime Administration,[62] that the Agency had the legal authority to remove provisions in two construction-differential subsidy contracts signed between the Agency and Grace Line barring domestic operations of two Grace Line vessels, in return for "repayment to the Government of the unamortized construction-differential subsidy. . . ."[63] The Comptroller General reasoned that, "Upon the basis of the rationale for the repayment of subsidy [provided for by section 506 of the Merchant Marine Act of 1936], it appears that if . . . the unamortized subsidy is repaid to the Government, the owner should be in the same position as if he had paid the full domestic price of the vessel . . . and should not be bound to operate the vessel exclusively in foreign trade."[64]

The *Grace Line* affair, however, is no precedent[65] for what the Agency has attempted to do here. First, the two Grace Line vessels were not *built* under construction-differential subsidy contracts; they were originally built *un*subsidized, then later converted from cargo to container vessels by subsidy funds for use in foreign trade.[66] The 1964 action by the Agency was on the proposal of Grace Line, which was experiencing difficulties in operating the vessels abroad, to sell the vessels to a domestic operator for use in the domestic trade.[67] As we discuss in Part V, *infra,* the fact that the vessels were originally constructed in American yards without subsidy is important for basic Merchant Marine Act policies.[68] Competing domestic operators could take the tonnage of these vessels into account at the time the vessels were built in making their own future investment decisions. However, in the instant case, American carriers estimating future demand for Alaskan oil tankers could not have known that the *Stuyvesant,* under construction in American yards *with* subsidy, would in its initial operation try to enter the Alaskan market in competition with unsubsidized vessels.[69]

Second, the request to return the Grace Line vessels to the unsubsidized fleet was unopposed, so far as the record shows. It is also significant that there was no court test of the validity of the Agency's action in removing the restrictions on the vessel's use.[70]

Finally, the 1964 Comptroller General's opinion is totally inconsistent with the trial

---

**61.** *See* Comptroller General Decision B–155039, 44 Comp.Gen. 180 (1964).

**62.** Memorandum from Graydon L. Andrews, Acting General Counsel, Maritime Administration, to the Chairman, Maritime Subsidy Board, Jt.App. vol. III at 660–65 (Memorandum dated 28 July 1964).

**63.** *See* Comptroller General Decision B–155039, *supra,* 44 Comp.Gen. at 184.

**64.** *Id.*

**65.** Appellants argue further that the Comptroller General Decision is incorrect on substantive grounds. *See* Brief for Alaska Bulk and Trinidad, *supra* note 8, at 33–34. In light of this court's opinion in the present case, we can only agree with appellants' argument. It is sufficient at present, however, to find that the Decision does not serve as precedent here.

**66.** *See* Comptroller General Decision B–155039, *supra,* 44 Comp.Gen. at 180.

**67.** *See id.*

**68.** These fundamental policies were nowhere considered in the 1964 Comptroller General Decision, *see id.,* or in the earlier memorandum of the Maritime Administration Acting General Counsel to the Maritime Subsidy Board, *see* note 62 *supra.*

**69.** *See generally* Brief for Alaska Bulk and Trinidad, *supra* note 8, at 6–8 (need to keep subsidized and unsubsidized fleets separate to enhance long-range investment decisions).

**70.** Furthermore, the Comptroller General Decision is not binding on this court. *See Keco Industries, Inc. v. Laird,* 318 F.Supp. 1361, 1363 (D.D.C.1970) (Comptroller General's opinion on legality of contract not binding on courts); *United States ex rel. Brookfield Construction Co. v. Stewart,* 234 F.Supp. 94, 100 (D.D.C. 1964), *aff'd,* 119 U.S.App.D.C. 254, 339 F.2d 753 (D.C. Cir. 1964) (Opinions of Comptroller General binding only on Executive Branch).

court's rationale as to the source of the Agency's authority to accept the return of subsidy in exchange for a waiver of use restrictions. The trial court specifically held that "*nothing* in section 506 . . . either expressly or implicitly addresses the issue of *permanent* revocation . . .,"[71] and rested its approval of the Agency's action on the ground that "such authority is inherent in the Secretary's broad contractual authority provided by sections 504 and 207, 46 U.S.C. §§ 1154 and 1117" and is "expressly contemplated by section 1104(a)(3), 46 U.S.C. § 1274(a)(3) . . ."[72] In 1964, however, the Comptroller General's opinion relied *solely* on § 506 as the source of the Agency's authority.[73] Therefore, we hold that the 1964 *Grace Line* opinion furnishes no precedent for the trial court's rationale of a permanent waiver authority implicit somewhere else in the Act.

Nor do we agree that "[s]ince the 1964 *Grace Line* transaction, the Secretary has consistently interpreted section 506 as *not* precluding permanent waiver of domestic trading restrictions . . .."[74] We find the Agency's internal interpretations of dubious consistency, and neither numerous nor impressive. In fact, the most thoroughly developed Agency interpretation cited by the court provides no support whatsoever for the Agency's action in the present case.[75] This Agency interpretation was formulated in response to the application in 1970 of Seatrain Lines, Inc., the parent corporation of the appellee Seatrain Ship-building Corporation here, for a construction-differential subsidy for two vessels other than the *Stuyvesant*. As part of its application, Seatrain sought from the Agency a contractual prior commitment to authorize future "*permanent* operation of the vessels in the domestic trade upon the repayment of the unamortized portion of . . . [the subsidy]."[76] In an opinion considering the legality of such a provision, the General Counsel to the Maritime Administration urged strongly against granting Seatrain's request because advance agreement to waive the prohibitions of § 506 would "conflic[t] . . . with the basic purposes of the . . . [construction-differential subsidy] provisions of the . . . [Merchant Marine Act of 1936]."[77] The General Counsel pointed out, as in the present opinion we have as well, that "Neither section 506 nor any other provision of the Act relating to the . . . [construction-differential subsidy] provides for releasing a . . . [ship built with such subsidy] from the domestic trade restrictions imposed by section 506 upon repayment of unamortized . . . [subsidy]."[78] The General Counsel no more than *implied* in his opinion that the Agency might have authority in a future case to grant a timely request for such a waiver,[79] and he set forth no circumstances or conditions under which he believed such approval would be appropriate.[80] It is incredible, therefore, that the trial court and appellees

71. *Shell Oil Co. v. Kreps et al., supra,* 445 F.Supp. at 1135.

72. *Id.* at 1134.

73. *See* Comptroller General Decision B–155039, *supra,* 44 Comp.Gen. at 181–84.

74. *Shell Oil Co. v. Kreps et al., supra,* 445 F.Supp. at 1137.

75. *See* Legal Opinion of H. Clayton Cook, Jr., General Counsel to Maritime Administration, Department of Commerce, Jt.App. at 666–68 (10 December 1970) [hereinafter cited as 1970 Seatrain Opinion].

76. *See id.,* Jt.App. at 666 (citing formulation of Seatrain's request by Department of Commerce) (emphasis in the original).

77. *Id.*

78. *Id.* at 668.

79. *See id.* ("To approve an application for . . . [subsidy] on the basis proposed by Seatrain would, in effect, bind future Boards to exercise a discretionary authority . . . .").

80. The opinion suggested only that the Government in granting any such waiver—the propriety of which the General Counsel directly questioned, see p. —— of 194 U.S.App.D.C., p. 830 of 595 F.2d *supra*—would need to be assured an "adequate consideration." *See id.*

in the present case find support in this General Counsel's opinion for the Agency's claim of authority to waive on a permanent basis the prohibitions of section 506.

The other Agency interpretations cited by the trial court are no more compelling.[81] The trial court reports that in 1976 the Agency amended two subsidy contracts to permit subsidy repayment and possible future entry into the domestic trade of two vessels operating between the Virgin Islands and the continental United States, "*if* the non-domestic status of the Virgin Islands is changed at some later date."[82] These contract amendments by the Agency were conditional and restricted, and are as yet unexercised and therefore unchallenged in any court. One further instance of Agency approval of a prospective waiver of domestic use restrictions on subsidized vessels has also been reported.[83] This waiver option, like that granted to the two vessels operating in the Virgin Islands trade, was apparently approved despite the earlier opinion of the General Counsel to the Maritime Administration in 1970 that such prospective agreement would "conflict with the basic policies" of the Merchant Marine Act of 1936 and, further, that no waiver of the § 506 proscription was authorized either by § 506 or by any other provision of that Act.[84] Also, the vessels which were the subject of this waiver, like the two Virgin Islands vessels, have not yet exercised their option and entered the domestic trade.[85]

Though the Agency actions on behalf of the owners of these various ships are arguably consistent with each other (if not with the advice of Agency legal counsel), they are all distinguishable on their facts from the present case, where an immediate rather than a prospective waiver is sought. The Agency actions do not, in any event, constitute compelling precedent in view of our present construction of the law, and clearly they do not bind this court.

The Grace Line reconversion remains the only instance of actual entry into domestic operations by vessels that received construction-differential subsidy, but, as discussed above,[86] this Agency action likewise does not serve as precedent here. We also do not believe, as will be discussed herein,[87]

---

81. *See Shell Oil Co. v. Kreps et al., supra,* 445 F.Supp. at 1137.

82. *See id.* (emphasis of the District Court). The Agency and shipowner in that instance were referring to § 21 of the Merchant Marine Act of 1920, 46 U.S.C. § 877 (1970), which excludes the Virgin Islands from the "coastwise laws of the United States . . . until the President shall . . . declare that such coastwise laws shall extend to the Virgin Islands . . . ." This provision has the effect, until possible reversal by the President, of exempting ships carrying goods to and from the Virgin Islands from the domestic flag-ship requirements of the "Jones Act," § 27 of the Merchant Marine Act of 1936, 46 U.S.C. § 883. *See American Maritime Association v. Blumenthal* (1978), 192 U.S.App.D.C. 40 at 48 n.43, 590 F.2d 1156 at 1164 n.43 (for limited purposes of Jones Act, Virgin Islands analogous to a foreign port). Owners of ships involved in the Virgin Islands trade may be understandably reluctant to bind themselves to an indefinite contractual bar against domestic use of those ships in light of the hotly contested status of the Virgin Islands exemption. *See id.,* at 51 & n.59, 590 F.2d at 1167 & n.59 (ten bills introduced in various sessions of Congress to modify or repeal Virgin Islands exemption). Though we pass no judgment on the matter at the present time, in light of the court's present opinion we doubt that it would be appropriate to allow a shipowner to effect an end-run around the domestic use proscriptions of § 506 of the Merchant Marine Act of 1936, at issue here, even under the anomalous and potentially variable circumstances of the Virgin Islands trade.

83. *See* Affidavit of James S. Dawson, Jr., Secretary of Maritime Administration and Maritime Subsidy Board, Jt.App. at 278, 280 (affidavit dated 28 September 1977) (approval granted in August 1977 of request by Wilmington Trust Company to repay construction-differential subsidy on two vessels under construction for trade between Indonesia and Japan).

84. *See* 1970 Seatrain Opinion, *supra* note 75, Jt.App. at 666, 668.

85. *See* Affidavit of James S. Dawson, *supra* note 83, Jt.App. at 280.

86. *See* pp. ———— & notes 59–72 of 194 U.S. App.D.C., pp. 829–831 & notes 59–72 of 595 F.2d *supra.*

87. *See* pp. ———— & notes 120–29 of 194 U.S.App.D.C., pp. 837–839 & notes 120–29 of 595 F.2d *infra.*

that Congress has in any sense "ratified" the Grace Line action by subsequent enactments.

## IV. SECTIONS OF THE MERCHANT MARINE ACT OF 1936 RELIED UPON BY THE AGENCY AND THE TRIAL COURT AS SOURCES OF AGENCY AUTHORITY

■ All parties to this appeal agree, and the trial court found,[88] that the Agency does have authority to accept total repayment of the construction-differential subsidy, if such repayment is offered. But, as is made amply clear by the argument of parties on this appeal, that is not the issue. The issue here is whether the Secretary has authority to lift permanently the restriction against entry of previously subsidized vessels into the domestic trade in return for such payment.[89]

We cannot assume that it follows as night follows day that if the subsidy is repaid in full, then the operating restriction against entry into the domestic trade must automatically be lifted. We have already set forth above the policy reasons that indicate why this should not be true,[90] and we develop these reasons more fully herein.[91] But policy arguments aside, for the Agency to take the extraordinary step of removing the restriction on the originally subsidized vessel's operation in the domestic trade to allow competition of that vessel with U.S. ships built without subsidy, the Agency must, in our view, find some specific authority in statutory law. The trial judge clearly and appropriately rejected the existence of any such authority, explicit or implicit, in § 506,[92] and he was right. The trial judge then turned to three other sections of the Act[93] to find such Agency authority, and there we think he was wrong.

Curiously, while the Government and the private party appellee here urge that affirmative authority to lift the operational restriction is found in sections 207, 504, and 1104(a)(3) of the Act, the trial court's opinion does not claim to find authority for lifting the restriction in those sections. The trial court said:[94]

> The threshold issue before the Court is whether the Secretary has authority to accept total repayment of . . . [construction-differential subsidy] in exchange for the removal of the domestic trade restrictions imposed by section 506 of the Act, 46 U.S.C. § 1156. Resolution of this issue requires this Court to determine first whether the Secretary has the general authority to accept total repayment of . . . [the subsidy] after the subsidy contract has been executed, and second, whether section 506 bars the Secretary from removing domestic trade restriction in exchange for such total repayment.

The trial court's analysis thus reflects an assumption that accepting total repayment is inextricably linked with removal of the domestic trade restriction—an assumption that it contradicts by citing other statutorily "permissible" reasons for which repayment might be made.[95] Though the trial court found no authority in section 506 or the other cited sections to waive domestic

---

88. *See Shell Oil Co. v. Kreps et al., supra,* 445 F.Supp. at 1138.

89. As the trial court pointed out, repayment of construction-differential subsidy may be made for purposes other than waiver of domestic use restrictions. *See id.* at 1134 n.1a ("permissible" repayment to obtain Title XI financing under 46 U.S.C. § 1274(b)(2) and for permission to engage in trade between foreign countries rather than between United States and foreign countries).

90. *See* pp. —— - —— of 194 U.S.App.D.C., pp. 818–819 of 595 F.2d *supra.*

91. *See* Part V *infra.*

92. *See Shell Oil Co. v. Kreps et al., supra,* 445 F.Supp. at 1135 (issue of authority to allow permanent revocation not "address[ed]" by § 506).

93. *See id.* at 1134 (citing sections 207, 504 & 1104(a)(3) of Merchant Marine Act of 1936).

94. *Id.* at 1133–34.

95. *Id.* at 1134 n.1a.

trade restrictions, but only to accept repayment of subsidy under "appropriate circumstances," [96] the court nevertheless resolved that such a waiver was not "addressed" and thus not "precluded" by those sections.[97] The court then sought to justify the waiver by reference to a claimed, long-standing Agency understanding of this right and the "implicit" ratification by Congress of this right in certain amendments passed in 1972.[98] Thus the trial court found little more than an *assumed authority to accept repayment* without discussing, *in relation to the relevant statutory sections, whether this also included authority to lift the domestic trade restriction.*

On this appeal the Government and private party appellees have recognized the distinction by strenuously arguing that an additional legal determination is necessary to their case, *i. e.*, that the three statutory sections *do* affirmatively confer authority to lift the restrictions. In our own analysis, this second finding is necessary to the appellees' case and to support the trial court's judgment; but we do not find such authority in any of the three sections cited, and instead we find that § 506 itself is a positive bar to lifting the restrictions.

We turn now to consider each of those three sections.

A. *Section 504, Title V, of the Merchant Marine Act of 1936 (46 U.S.C. § 1154)*

Section 504 grants to the Agency certain contractual powers: arguably the power both to make and to amend contracts conferring construction-differential subsidies, and the right to include terms which will protect the interest of the United States in subsidy contracts.[99] However, this contractual authority is not so broad as to eliminate restrictions mandated by statutes enacted specifically to protect maritime interests,[100] as the last sentence of § 504 makes unmistakably clear: [101]

> The contract of sale, and the mortgage given to secure the payment of the unpaid balance of the purchase price, shall not restrict *the lawful or proper use or operation of the vessel, except to the extent expressly required by law.*

Certainly, "lawful or proper use or operation of the vessel" requires conformity with other sections of the Merchant Marine Act, and with other statutes. Specifically, we think such use and operation must be in

96. *See id.*

97. *Id.* at 1135, 1138.

98. *Id.* at 1137–39.

99. Section 504 of the Merchant Marine Act of 1936, 46 U.S.C. § 1154, provides in pertinent part:

> If a qualified purchaser under the terms of . . . [Subchapter V of the Act, 46 U.S.C. §§ 1151–61] desires to purchase a vessel to be constructed in accordance with an application for construction-differential subsidy under this subchapter, the Secretary of Commerce may . . . contract to pay only construction-differential subsidy and the cost of national defense features to the shipyard constructing such vessel. The construction-differential subsidy and payments for the cost of national defense features shall be based upon the lowest responsible domestic bid . . . . No construction-differential subsidy, as provided in this section, shall be paid unless the said contract or contracts or other arrangements contain such provisions as are provided in this subchapter to protect

> the interests of the United States as the Secretary of Commerce deems necessary. Such vessel shall be documented under the laws of the United States . . . . The contract of sale, and the mortgage given to secure the payment of the unpaid balance of the purchase price, shall not restrict the lawful or proper use or operation of the vessel, except to the extent expressly required by law.

100. As the Appellee Secretary of Commerce concedes, ". . . [Section 504] does not specifically address the question whether the Secretary may later agree to amend the subsidy contract to recoup the subsidy in appropriate circumstances. . . ." Brief for the Secretary of Commerce and Other Federal Appellees at 49. *Accord,* Brief for Alaska Bulk and Trinidad, *supra* note 8, at 13 ("Nothing in section 504 speaks to authorization for the Secretary of Commerce to accept a payback of construction-differential subsidies for any reason. The section confers only authority to pay the subsidy, and says nothing about repayment.").

101. *See* 46 U.S.C. § 1154 (1970) (emphasis added).

conformity with § 506.[102] The appellees agree that this language of § 504 refers to, among other provisions, the § 506 domestic trade restriction, but argue that § 506 does not purport to speak to the situation where the subsidy is repaid in full in exchange for an unlimited waiver.[103] As discussed above, we hold that § 506 does contain an implicit prohibition against a waiver unlimited in time.

In short, we find nothing whatsoever in § 504 which would authorize the lifting of the domestic trade restriction of § 506. To the contrary, the reference to "lawful or proper use or operation" refers to the § 506 restriction against entry of a subsidized vessel into the domestic trade.

### B. Section 207, Title V, of the Merchant Marine Act of 1936 (46 U.S.C. § 1117)

[11] At oral argument, in discussing the statement in the Government's brief that "the Secretary will consider the advisability of issuing proposed guidelines or rules outlining the exceptional circumstances which might justify . . . [permanent waiver of domestic trade restrictions] in the future," [104] Government counsel was asked on what section of the Merchant Marine Act these guidelines and rules would be based. He immediately responded, "Section 207, which gives the Secretary contractual powers . . . ." [105] This was consistent with the position taken in the Government's appellate brief, which cited § 207 as the Agency's basic source of authority to take the action at issue here.[106]

The pertinent part of § 207 states: [107]

The Federal Maritime Commission and the Secretary of Commerce may enter into such contracts, upon behalf of the United States, and may make such disbursements as may, in its or his discretion, be *necessary to carry on the activities authorized by* [. . . *the Merchant Marine Act of 1936*] *or to protect, preserve, or improve the collateral held by the Commission or Secretary to secure indebtedness,* in the same manner that a private corporation may contract within the scope of the authority conferred by its charter.

We think § 207 is what is commonly called a "housekeeping statute," and a similar provision is found in nearly every administrative agency basic statute. It is a section which details the means and methods of implementation of specific powers which are granted elsewhere in the statute. It is not an independent grant of power in itself.[108] The authority to make and amend

---

102. This view is reinforced by review of the legislative history of the last sentence of § 504, which was added to the section by amendment in 1951. Reports of both the House and Senate Committees responsible for acting on that amendment stated explicitly: *"Subject to the exceptions contained in section 506 of the 1936 act as to use in domestic trades,* sections 1 and 4 [of the amendments] . . . provide that the lawful or proper use of a vessel constructed with . . . [construction-differential subsidy] may not be restricted." S.Rep.No.295, 82nd Cong., 1st Sess. 4 (1951); H.R.Rep.No. 2221, 82nd Cong., 2d Sess. 25 (1952); U.S.Code Cong. & Admin.News, 1952, pp. 2335, 2355 (emphasis added).

103. *See, e. g.,* Brief for the Secretary of Commerce and Other Federal Appellees at 50.

104. *See id.* at 31.

105. *See* Statement of Michael Kimmel, *supra* note 32.

106. *See* Brief for the Secretary of Commerce and Other Federal Appellees at 27–30.

107. 46 U.S.C. § 1117 (1970) (emphasis added).

108. An analogous provision is 15 U.S.C. § 717o (1976), which confers general administrative powers on the Federal Power Commission to "perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of" the Natural Gas Act, Pub.L.No.75–688, 52 Stat. 821, 830 (21 June 1938), as amended. Courts have universally held that this provision, which is even more specific in conferring powers on the Federal Power Commission than § 207 of the Merchant Marine Act of 1936 is in conferring powers on the Agency, *see* 46 U.S.C. § 1117, does not enlarge the powers of the Commission conferred elsewhere in the Act. *See, e. g., New England Power Co. v. Federal Power Commission,* 151 U.S.App.D.C. 371, 376–77, 467 F.2d 425, 430–31 (1972), aff'd, 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974) (section 717 merely augments existing powers conferred upon Commission by Congress and confers no independent authority to act); *Mur-*

contracts cannot imply the authority to enter into a contract in violation of another section of the same Act or other applicable law, or without a power conferred in another section, just as the power to enter into contracts commonly conferred by corporate charter cannot authorize a corporation to enter into contracts foreign to the purposes of the corporate charter or in violation of law.

In *Dollar v. Land*,[109] a case analogous to the present one, this court concluded that § 207 conferred no powers upon the Agency not otherwise specified in the Merchant Marine Act of 1936. In *Dollar* the Maritime Commission argued that, upon the authority of § 207, it had power to take title to stock of a steamship company. We stated in that case:[110]

> The power to own and operate transoceanic steamship lines is a power of tremendous scope. . . . It is inconceivable to us that Congress would have left to implication so vast a power. We do not think that if Congress had intended the Maritime Commission to enter upon such ownership and operations it would have left the matter entirely to a clause which merely authorized the Commission to execute contracts.

Similarly, § 207 cannot be a foundation of Agency power to waive statutorily imposed restrictions and thus upset the vital underlying purposes of the Merchant Marine Act, or, indeed, to exercise any power not otherwise granted in the Act or other statute.

C. *Section 1104(a), Title XI, of the Merchant Marine Act of 1936 (46 U.S. C.A. § 1274(a)(3))*

While the Government appellees rely principally upon § 207 as a source of Agen-

cy authority, the private party appellees and the trial court rest more strongly upon § 1104(a)(3). The trial court concluded that ". . . [T]he Secretary does in fact possess general authority to accept total . . [subsidy] repayment in appropriate cases. . . . [T]his authority is expressly contemplated by section 1104(a)(3), 46 U.S.C. § 1274(a)(3) . . . ."[111]

■ The trial court turned to § 1104(a)(3) after finding a "total dearth of guidance from the statutory language and the legislative history [of § 506]," [112] an area in which we have found decisive guidance. Yet § 1104(a)(3) does not deal with the issue of construction-differential subsidy at all. It is not part of Title V, which pertains to such subsidies, but of Title XI, which authorizes Government guarantees of private loans to finance shipbuilding in American yards.[113]

Section 1104(a)(3) was added in 1972 to extend the Agency's authority to make guarantees, and provides that the Secretary:[114]

> . . . may guarantee or make a commitment to guarantee, payment of the principal of and interest on an obligation which aids in—
>
> (3) financing, in whole or in part, the repayment to the United States of any amount of construction-differential subsidy paid with respect to a vessel pursuant to . . . [Title] V of this . . . [Act].

On its face, this provision gives no authority to repay subsidy, much less to lift any statutory operational restrictions. All it does is provide a means for *financing* repayment, if

phy Oil Corp. v. Federal Power Commission, 431 F.2d 805, 810–11 (8th Cir. 1970) (no enlargement of specific authority of Commission granted in § 717); *Texaco, Inc. v. Federal Power Commission*, 412 F.2d 740, 742–43 (3d Cir. 1969) (rulemaking procedural requirements not waived by § 717).

**109.** 87 U.S.App.D.C. 214, 184 F.2d 245 (1950), *cert. denied*, 344 U.S. 806 (1952).

**110.** *Id.*, 87 U.S.App.D.C. at 214, 184 F.2d at 249.

**111.** *See Shell Oil Co. v. Kreps et al., supra*, 445 F.Supp. at 1134.

**112.** *Id.* at 11.

**113.** *See* 46 U.S.C. §§ 1271–80 (1970) (Federal Ship Mortgage Insurance).

**114.** 46 U.S.C.A. § 1274(a) & 1274(a)(3).

such repayment is otherwise authorized by statute.

How, when, and by what authority subsidy can be repaid must be found in Title V,[115] not Title XI [116] of the Act. Title V provides for two general conditions under which subsidy may be repaid, and both are found in § 506.[117] The 1938 amendment removed any ambiguity in Title V, and there is no conflict between Title V and § 1104(a)(3) of Title XI. Nothing in Title XI changes the plain meaning of § 506 of Title V.

Underlying the appellees' and the trial court's rationale that somehow the 1972 amendment to Title XI provides authority to perform an act—the permanent waiver of trade restrictions—which is contrary to the implicit prohibition of § 506 of Title V, in spite of the fact that if such authority were granted we would expect to find it in § 506 and nowhere else, is the failure to recognize that there may be reasons for subsidy repayment completely unrelated to domestic trading. A shipowner might choose to repay subsidies in order to be eligible for refinancing up to 87½% of the vessel's cost,[118] or perhaps to escape U.S.-flag requirements as to manning and other U.S. rules of vessel operation.[119] As we have pointed out before, no party here argues that any section of the Merchant Marine Act prohibits the Agency's acceptance of subsidy repayment, but the Agency's power to waive permanently the § 506 domestic trading restriction is quite another matter.

In summary, § 1104(a)(3) reflects only a congressional understanding that subsidy may be repaid, either under § 506 of Title V

or for other reasons unrelated to entry into the domestic trade. It says nothing about authority of the Agency to grant trade restriction waivers.

Strangely, however, the argument of appellees and the rationale of the trial court really do not rest upon the language of § 1104(a)(3) as enacted in 1972, but on language which was proposed but *never enacted.*[120] An initial draft of this section in 1971 provided for: [121]

. . . financing, in whole or in part, [of] the repayment to the United States of any amount of construction-differential subsidy paid with respect to a vessel pursuant to Title V of this Act, as amended, [ENACTED] in order to release such vessel from all restrictions imposed as a result of the payment of construction-differential subsidy, when such repayment is permitted by the Secretary of Commerce after considering the competitive effect of releasing such vessel from such restrictions. [NOT ENACTED]

It is the above language *which was never enacted* which the appellees and the trial court cite as a source of the Agency's present authority to release subsidized vessels from operating restrictions. They reach this conclusion by citing language in the House Report which commented on the deleted language,[122] and by concluding that the *non*enactment shows that the Agency already had such powers and that the 1964 *Grace Line* action was thereby confirmed by a later Congress. Unfortunately for this singularly convoluted line of reasoning, both the House and Senate disclaimed any intention of so doing.

**115.** 46 U.S.C. §§ 1151–61 (1970).

**116.** 46 U.S.C. §§ 1271–80 (1970).

**117.** *See* 46 U.S.C. § 1156 (1970).

**118.** *See* 46 U.S.C.A. § 1274(b)(2).

**119.** Such relief could be won by gaining permission from the Agency to engage in foreign-to-foreign trade rather than trade between the United States and foreign countries. *See Shell*

*Oil Co. v. Kreps et al., supra,* 445 F.Supp. at 1134 n.1a.

**120.** *See id.* at 1137; Brief for Seatrain and Polk Tanker, *supra* note 15, at 16–17; Brief for Secretary of Commerce and Other Federal Appellees at 43–45.

**121.** H.R. 9756, 92d Cong., 1st Sess. § 3 (1971).

**122.** H.R.Rep.No.92–688, 92d Cong., 1st Sess. (1971).

838

The language of the House Report relied on by the appellees and the trial court reads as follows: [123]

In the entire history of the administration of the 1936 Act there has been only one instance where a construction-differential subsidy repayment, authorized by the Secretary under very special circumstances, could have called into play the provisions of this paragraph. Your committee questions the desirability of general legislation to deal with such an unusual situation, and feels that Title XI assistance should be extended to all instances of subsidy repayments under Title V, so as to include the relatively frequent situation of repayments under the first sentence of section 506 of the Act. Your Committee has therefore amended the legislation by deleting the language [specifying the conditions under which repayment could be accepted and trade restrictions waived]. . . .

There are several points vitiating the reliance of the appellees and the trial court on this language. First, it is clear that the Committee regarded the *Grace Line* case as a "very special circumstanc[e]" and "an unusual situation," [124] and chose the path of leaving such matters entirely to the courts rather than enshrining any principle in general legislation. So the Congress specifically declined to adopt the Agency's *Grace Line* action as a general principle. As aptly stated by one appellant here, "The most that can be said about the . . . [intent of Congress in 1972 is that it] declined to commit itself on the issue." [125]

Second, the language of § 1104(a)(3) refers specifically to subsidy repayments under Title V.[126] Yet the only types of domestic trade restriction waivers authorized call-

ing for subsidy repayments under Title V are those cited in § 506, which are limited to certain world voyages embracing ports in the U.S. coastwise trade and to temporary periods not to exceed six months.[127]

Third, and most importantly, the House Committee Report quoted above contains a sentence following the portion quoted and relied upon by the trial court, which the trial court omitted. That sentence reads: "This paragraph [§ 1104(a)(3)] in Title XI does not in any way extend or affect the application of Title V of the Act." [128] The Senate Report contained the same language omitted by the trial court: [129]

Paragraph (3) [of § 1104(a)] is new. This paragraph would permit the Secretary of Commerce to guarantee an obligation which aids in financing, in whole or in part, the repayment to the United States of any amount of construction-differential subsidy pursuant to Title V of the Act. *This paragraph in Title XI does not in any way extend or affect the application of Title V of the Act.*

Nothing whatever was said in the Senate Committee report about the *Grace Line* matter or authorizing waiver of domestic trade restrictions.

The bottom line of the legislative history of § 1104(a)(3) in both House and Senate is clear: "This paragraph in Title XI does not in any way extend or affect the application of Title V of the Act." We think that no inference of reaffirmed or expanded waiver authority can be drawn from either the congressional action or the Reports with regard to § 1104(a)(3). Congress plainly refused to ratify the *Grace Line* action or to permit the enactment of § 1104(a)(3) to

123. *Id.* at 10.

124. *See id.*

125. *See* Brief for Alaska Bulk and Trinidad, *supra* note 8, at 27.

126. *See* 46 U.S.C.A. § 1274(a)(3) (providing for ". . . financing [of] . . . the repayment . . . of construction-differential subsidy paid . . . pursuant to . . . [Title V] . . . .").

127. *See* 46 U.S.C. § 1156 (1970).

128. H.R.Rep.No.92–688, 92d Cong., 1st Sess. 10 (1971).

129. S.Rep.No.92–1137, 92d Cong., 2d Sess. 9 (1972); U.S.Code Cong. & Admin.News 1972, pp. 3851, 3859 (emphasis added).

change Title V as the statutory section determining exclusively the circumstances under which subsidy can be repaid in exchange for a lifting of trade restrictions.

## V. POLICY OF THE MERCHANT MARINE ACT OF 1936

In *Sea-Land Service, Inc. v. Kreps*,[130] a case involving the award of operating-differential subsidy under Title VI of the Merchant Marine Act of 1936,[131] we indicated that when "[t]he relevant statutory language provides no direct guidance in resolving . . . [a] dispute" over that statute's proper application, both the Agency and the reviewing court "must of necessity look to the *purposes* underlying the particular statutory provision and the Act in general . . . ."[132] It should be clear that in the present case we believe there is much guidance to be derived from the language of the statute itself, particularly § 506 of Title V. In addition to this, we now turn to consider whether the Agency's interpretation of the statute on which its action in the instant case is based will in the long run further the purposes of the legislation in a reasonable and sound manner.

█ We believe there is risk of harm to the overall and long-term policies of the Merchant Marine Act in sustaining the Agency action here. The policy of the Act is to create a protected area of purely American shipbuilding and ship operation in the domestic coastwise trade. This is accomplished by excluding all foreign-built or foreign-operated vessels from this trade. The American shipowner and shipbuilder then knows that he must compete only with like-situated American shipowners and shipbuilders, and he can adjust his sights accordingly. On the basis of known economic facts, the builder or operator makes his

calculations of the market and of competition, in which the Government plays no direct part, except in administering guarantees of construction loans available equally to all.

The American shipowner and shipbuilder competes in foreign trade on an entirely different economic footing. To compete with foreign shipping, the American builder and operator are able to secure up to 50% of a ship's construction costs from the U.S. Government. The purpose of this policy is to enable the American operator to compete initially with foreigners on an equal basis of cost per ship, and to sustain the viability of American shipyards. The American operator is further aided by an operational-differential subsidy, which compensates him for the recognized extra cost of American crews. The American shipbuilder and operator know the competitive factors present in the foreign trade, and they are assisted by U.S. Government funds in meeting foreign competition.

Given these two completely separate competitive areas, unsubsidized American vessels have always operated in the protected, Jones Act domestic trade, while subsidized American vessels, in accord with the restriction of § 506, have always operated in the foreign trade.[133] To permit a ship heavily subsidized in its construction cost to compete with unsubsidized U.S.-built ships is to introduce into the domestic portion of our maritime trade a totally variable and incalculable factor. While the Government may feel that it should be able to take whatever action is necessary to free itself of its unfortunate financial obligations here, and though indeed there may be public (but not maritime) policy arguments strongly in its favor, yet the transfer of, first, the *Stuyvesant* and possibly later of the *Bay Ridge*[134] into the domestic trade would in-

130. 566 F.2d 763 (D.C. Cir. 1977).

131. 46 U.S.C. §§ 1171–83a (1970).

132. *Sea-Land Service, Inc. v. Kreps, supra,* 566 F.2d at 773.

133. The two Grace Line vessels may be the only possible exceptions. *See* pp. ——–—— &

notes 59–86 of 194 U.S.App.D.C., pp. 829–833 & notes 59–86 of 595 F.2d *supra.*

134. The *Bay Ridge* was under construction in the Brooklyn Naval Yard at the same time as the *Stuyvesant. See* Brief for the Secretary of Commerce and Other Federal Appellees at 15–16.

evitably have a depressive impact on the future of American shipbuilding and ship operation by American owners. To accomplish a short-term Government goal, the actions of the Agency here would imperil a carefully conceived, long-established, and far-sighted maritime policy of the United States.

## CONCLUSION

We find the Agency's action unauthorized by any applicable statute, prohibited by § 506 of the Merchant Marine Act of 1936, and contrary to the overall congressional policy expressed in the structure of that Act. The decision of the District Court is reversed, and the case is remanded to the District Court with instructions to enter an appropriate order granting the plaintiff-appellants the relief requested.

*Reversed and Remanded.*

BAZELON, Circuit Judge, dissenting:

Although the majority gives a plausible account of the statutory framework governing this case, I am persuaded that nothing in the Merchant Marine Act precludes the Secretary from waiving domestic trading restrictions in return for total repayment of subsidy. In my view, the Secretary had ample authority to enter into the contractual modification at issue in this case, and in exercising that authority she did not abuse her discretion. I therefore respectfully dissent from the decision to reverse the district court.

1. Majority Op. at ⸺ of 194 U.S.App.D.C., at 829 of 595 F.2d.

2. H.R.Rep.No.2168, 75th Cong., 3d Sess. 21 (1938).

3. *See,* Preliminary Report of the Special Committee of the Senate to Investigate Air Mail and Ocean Mail contracts. S.Rep.No.898, 74th Cong., 1st Sess. 1933.

4. P.L. 74–835, 49 Stat. 1999 (1936), the original § 506 provided *inter alia* :
   It shall be unlawful to operate any vessel, for the construction of which any subsidy has been paid pursuant to this title, other than exclusively in foreign trade, or on a round-the-world voyage or a round voyage from the

## I.

I cannot agree that the 1938 Amendments to the Merchant Marine Act of 1936 "unmistakeably manifested"[1] Congress' intention to preclude total repayment of the construction differential subsidy in return for a permanent waiver of the domestic trading restrictions contained in § 506 of the Act. The Report of the House Committee on Merchant Marine and Fisheries observed that "[n]o fundamental change . . . has been effected" in § 506 by the 1938 Amendments.[2] The original version of § 506 was part of Congress' effort to strengthen the American built and operated "foreign-going" fleet through the creation of a "construction differential subsidy," which replaced the much abused "ocean mail contract subsidy" program. One of the principal failures of the ocean mail subsidy was the diversion of subsidy payments from foreign to domestic service, providing the subsidized operators an unfair advantage over the unsubsidized, "Jones Act" operators.[3]

The 1936 Act eliminated much of the unfair competition by restricting the conditions under which a ship built with a construction subsidy could engage in the domestic trade. At the heart of the original § 506 was the requirement that owners of subsidized vessels must repay a portion of the construction differential subsidy corresponding to the remaining economic life of the vessel in order to engage in direct competition with the unsubsidized, Jones Act fleet.[4]

west coast of the United States to a European port or ports or a round voyage from the Atlantic coast to the Orient which includes intercoastal ports of the United States, or on a voyage in foreign trade on which the vessel may stop at an island possession or island territory of the United States, unless the owner of such vessel shall receive the written consent of the Commission so to operate and prior to such operation shall agree to pay to the Commission, upon such terms and conditions as the Commission may prescribe, an amount which bears the same proportion to the construction subsidy theretofore paid or agreed to be paid (excluding cost of national-defense features as hereinbefore provided), as the remaining economic life of the vessel

The remaining text of § 506, however, introduced a central ambiguity into the operation of the section, an ambiguity that led to the 1938 amendment.[5] The original § 506 could be read to permit permanent waiver of the domestic trade restrictions, contingent on proportional repayment of subsidy, as well as "emergency" temporary waiver of restrictions without the need to pay back any of the construction differential subsidy. Alternatively, the section could be read to permit only temporary waivers, coupled with the requirement of payback.

As Judge Wilkey notes, the former is the more plausible interpretation of the original § 506.[6] Accordingly, the "original purpose" of § 506 included the possibility of permanent waiver so long as the source of unfair competition, the previously granted construction differential subsidy, was eliminated. In contrast, the ability to secure emergency temporary waivers without the required payback of subsidy did provide operators of subsidized vessels a significant advantage over their Jones Act competitors. It therefore seems likely that Congress was addressing this latter situation when clarifying the "original purpose" of § 506. Congress clearly eliminated the temporary waiver advantage, since the amended § 506 clearly requires a payback of subsidy for even temporary transfers.

Nonetheless, it is undeniable that in eliminating the 3-month temporary transfer for which no subsidy need be repaid, Congress also eliminated from § 506 the language that appeared to authorize permanent transfer from foreign to domestic service. Despite its expressed intention not to alter the "original purpose" of the section, the House Report stated:

> The section has been entirely rewritten in order to remove ambiguities arising from the method of describing the services other than foreign. . . . If the vessel is used, with the consent of the Commission, in the domestic trade in services other than those enumerated, *the obligations of the owner to repay part of the subsidy are clearly defined.*[7]

The clearly defined obligation of the amended § 506 includes partial, but not permanent repayment of subsidy. Yet nowhere in the legislative history is there any indication that permanent waivers, apparently permissible under the 1936 Act, were expressly considered and eliminated in 1938.[8]

---

bears to its entire economic life. If an emergency arises which, in the opinion of the Commission, warrants the temporary transfer of a vessel, for the construction of which any subsidy has been paid pursuant to this title, to service other than exclusive operation in foreign trade, the Commission may permit such transfer: *Provided,* That no operating differential subsidy shall be paid during the duration of such temporary or emergency period, *and such period shall not exceed three months.*

5. *See* note 3, *supra.*

6. Majority Op. at —— of 194 U.S.App.D.C., at 826 of 595 F.2d.

7. H.R.Rep.No.2168, *supra,* note 2, at 21 (emphasis added).

8. Compare Majority Op. at —— of 194 U.S.App. D.C., at 828 of 595 F.2d. The discussion of the amendment to § 506 was sparse. In addition to the above-discussed House Report, reference to the amendment was limited to: 1) a brief similar comment in the Senate Report, S.Rep.No.1618, 75th Cong., 3d Sess. 12–13 (1938), *quoted in pertinent part* in Majority Op.

at —— n.52 of —— U.S.App.D.C., at 828 n.52 of 595 F.2d; 2) the comment of Maritime Commission Chairman Joseph P. Kennedy in introducing the 1938 Amendments, *see Amending Merchant Marine Act, 1936, hearings on H.R. 8532 before the House Committee on Merchant Marine and Fisheries,* 75th Cong., 2d Sess. 8 (1938) *quoted in* Majority Op. at 25–27; and 3) the testimony of E. M. Bull (president of an unsubsidized carrier), *id.* at 251–258; John T. Corbett (representing the Brotherhood of Locomotive Engineers), *id.* at 571–72; and Edgar F. Luckenbach (president of an unsubsidized carrier), *id.* at 105–06. Although none of the comments can be fairly characterized as resolving the question before this court, it is instructive that the comments of the unsubsidized operators, Bull and Luckenbach, generally criticized the amendments as extending rather than restricting the right of subsidized operators to compete with the unsubsidized vessels. The failure of these witnesses to comment favorably on the apparent elimination of the right to transfer permanently may be some indication that eliminating the permanent waiver was not intended. Alternatively, their failure to address permanent transfer may suggest that the pros-

## II.

In 1964, the Comptroller General issued his decision in *Grace Line* [9] upholding the Secretary of Commerce's authority to remove domestic trading restrictions in return for repayment of the unamortized construction differential subsidy. Although there are some factual differences between the present case and *Grace Line*, I do not believe that they are material to the question of the Secretary's authority, since the action taken in *Grace Line* was not contemplated by the express language of § 506 any more clearly than the present action of the Secretary.

I find the Comptroller's rationale in *Grace Line* questionable. The Comptroller's reasoning began with the observation that ships built with subsidy would be permitted to engage in domestic activities without restriction once the subsidy had been fully depreciated. In the Comptroller's view, this represented a congressional judgment that when the unfair advantage created by the subsidy terminated, the reasons for the restriction would expire, thus justifying unrestricted domestic trading by previously subsidized vessels. Applying the same reasoning to an "accelerated amortization" through repayment, the Comptroller concluded that the purpose of the restrictions would lapse upon repayment, and the Secretary could then permit domestic trading, consistent with the Act.

The difficulty with this argument is that the statute explicitly contemplates a subsidized ship entering unrestricted domestic trade after the economic life of the subsidized vessel had expired, without any further repayment of subsidy.[10] In contrast,

no such explicit provision governs "accelerated" amortization.

Although *Grace Line* thus does not stand as well-reasoned precedent, it is precedent nonetheless, and appellees argue that subsequent congressional actions represent ratification of at least the result in *Grace Line*.

In 1970, Congress enacted a number of amendments to the Merchant Marine Act designed to promote American ship-building for the foreign trade, but § 506 was left intact.[11] However, Congress' failure to amend § 506 under those circumstances cannot be viewed as a ratification of *Grace Line*, since the issue of transfer from the foreign to domestic trade was not germane to the principal focus of the Amendments.

A stronger case can be inferred from Congress' amendment in 1972 of § 1104 of the Merchant Marine Act.[12] As introduced, the new § 1104(a)(3) clearly contemplated the release of the domestic trading restrictions in return for full repayment of subsidy. The House Committee however, deleted the explicit reference to repayment in return for lifting the trading restrictions, observing:

> In the entire history of the administration of the 1938 Act there has been only one instance where a construction-differential subsidy repayment, authorized by the Secretary under very special circumstances, could have called into play the provisions of this paragraph. Your committee questions the desirability of general legislation to deal with such an unusual situation and feels that Title XI assistance should be extended in all instances of subsidy repayments under Title V, so as to include the relatively frequent situ-

10. P.L. 88–225, 77 Stat. 469 (1963), 46 U.S.C. § 1125 (note) (1970), amended the basis for computing the amount of subsidy to be repayed pursuant to § 506. Application of that formula yields a zero repayment once the subsidy has been fully depreciated.

11. Merchant Marine Act of 1970, P.L. 91–469, 84 Stat. 1018 (1970).

12. Federal Ship Financing Act of 1972, P.L. 92–507, 86 Stat. 909 (1972).

pect of a permanent waiver accompanied by repayment of subsidy was not viewed as a threat to domestic, unsubsidized carriers. It is clear from the testimony that the principal concern of the unsubsidized operators was the ability of subsidized ships to move back and forth between foreign and domestic service, enjoying the benefits of subsidy on their foreign voyages and entering the domestic service only on the choicest routes and occasions. Permanent transfer does not pose similar problems.

9. 44 Comp.Gen. 180 (1964).

ation of repayments under the first sentence of section 506 of the Act. Your committee therefore has amended the legislation by deleting the language.[13]

There are three items of note in the quoted passage. First, Congress showed a clear awareness of the *Grace Line* precedent. Second, by characterizing the purpose of the language so as "to include" partial repayments, Congress intended that other types of repayment might occur.[14] Finally, Congress indicated that the enactment of § 1104(a)(3) was not, in its view, an alteration of Title V. Thus, whether or not such repayments were intended must be gauged by the Act as it stood prior to 1972. But in judging what restrictions Title V imposed prior to 1972, we must take into account Congress' awareness of *Grace Line* as an interpretation of Title V.

I have little doubt that in enacting the 1972 Amendments the House Committee clearly contemplated the use of § 1104(a)(3) loans for precisely the sort of repayment of subsidy at issue in *Grace Line* and here, albeit with the expectation that full repayment would be rare. There is no note of disapproval in the House Committee's discussion of *Grace Line*. A fortiori, the House Committee must have believed the Secretary had the *authority* to accept repayment in return for waiving domestic trading restrictions, and that Title V posed no barrier to such an arrangement.

### III.

This result is perfectly consistent not only with the overall purposes of the Act (fostering the development of a U.S.-flag, U.S.-built merchant marine) but is equally consistent with the purpose of the trading restrictions imposed by § 506. Unlike the temporary transfers, a permanent transfer does not allow the vessel's operator to take advantage both of the benefits of subsidy in foreign trading, and the protection of the Jones Act in domestic trading. Full repayment of subsidy irrevocably places the transferred vessel on the same footing as all other ships in the Jones Act fleet, without affording an unfair advantage to the previously subsidized operator.[15] The only conceivable harm to the Jones Act operators is an increase in competition from an additional U.S.-flag, U.S.-built vessel. I do not believe it is the purpose of § 506 in particular, or the Merchant Marine Act as whole, to protect Jones Act operators from this type of competition.[16]

The fact that the 92nd Congress thought that § 506 did not preclude removal of

13. H.R.Rep.No.72–688, 92d Cong., 1st Sess. 9–10 (1971).

14. Admittedly, the fact that full repayment was contemplated by the 1972 amendments is not in itself sufficient to establish congressional approval of removing domestic trading restrictions in return for that repayment. There are other reasons why an operator might seek to repay the subsidy. For example, the operator might seek the right to engage in foreign-to-foreign, rather than foreign-to-U.S. trade, with the attendant relief from U.S. flag requirements. Alternatively, repayment of subsidy would make the operator eligible to secure financing of up to 87½% of the cost of the vessel.

15. To the extent that the Secretary did not require a repayment of subsidy *with interest,* the owners of the Stuyvesant did receive an unfair advantage. Accordingly, I would modify the decision of the district court to require the amount of repayment to include interest on the subsidy.

16. This raises an interesting question of appellants' standing to challenge the Secretary's de-

cision. The issue of standing is not addressed in Judge Wilkey's opinion. I take it that the only "injury in fact" which appellants can allege is the harm from additional competition. Although I believe this is an adequate basis for appellants' standing, *see Ass'n of Data Processing Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), it demonstrates that appellants are concerned primarily with insulating their vessels from competition. Although the nation's merchant marine policy does shield domestic carriers from competition by foreign built vessels, as well as from unfair competition by subsidized vessels, it was not intended to limit the competition among American built, unsubsidized vessels. Appellant Shell argues that "[p]ersons planning to construct unsubsidized vessels must be able to assess future vessel supply in the legislatively protected domestic market." Reply Br. for Shell at 3. This mischaracterizes the protection created by the Jones Act and § 506, since the builder of an unsubsidized vessel has no way of knowing how many other unsubsidized vessels might be built in the future.

domestic trading restrictions in return for full repayment does not conclusively end our inquiry. Although the views of subsequent Congresses are entitled to significant weight, *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974), where the intent of the enacting Congress is unmistakable, it is the latter that controls, unless expressly overriden by the positive act of a later Congress. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 354 n. 39, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The difficulty posed by this case is, on the one hand, the original intent is not unmistakable (as in *Teamsters*) but, on the other hand, the intention of the later Congress was not embodied in legislation directly affecting the ambiguous provision, that is, Title V.

Although the matter is not free from doubt, I would affirm the decision of the district court, subject to the qualification expressed in note 15, *supra*.[17] My conclusion is buttressed by the language in both §§ 501 and 504 of the Act, 46 U.S.C. §§ 1151 and 1154 (1970), that "[t]he contract of sale . . . shall not restrict the lawful or proper use or operation of the vessel, except to the extent *expressly* required by law." (Emphasis added.) Taking all the relevant guides to interpretation together, I cannot say that the Secretary's interpretation is unreasonable. *See Udall v. Tallman*, 380 U.S. 1, 16–18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), nor that there are "compelling indications" that her interpretation is wrong, *see E. I. du Pont de Nemours & Co. v. Collins*, 432 U.S. 46, 54–55, 97 S.Ct. 2229, 53 L.Ed.2d 100 (1977); *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 121–22, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973).

Despite the statement of counsel for the Secretary at oral argument, I do not believe the question of whether the Secretary must make a finding of necessity for a full repayment is relevant to the Secretary's authority to accept such repayment, since full repayment is not expressly covered by § 506.[18] A finding of need is mandated by § 506 for *partial repayment* and *temporary transfer.* This is consistent with a concern that subsidized carriers not take unfair advantage of unsubsidized carriers simply to skim off the most lucrative domestic trade and return at will to foreign service. In contrast, full repayment places the formerly subsidized carrier on an equal footing with the other vessels in the Jones Act fleet, and the possibilities of abuse are thereby eliminated. Nonetheless, the Secretary cannot arbitrarily agree to accept repayment, but rather must provide a reasoned basis for that action. The circumstances of this case provide ample support for the Secretary's discretionary decision to accept repayment.

---

**17.** Assuming that § 506 does not *preclude* full repayment of subsidy in return for removing domestic trading restrictions, I believe the Secretary has the authority, pursuant to § 207 of the Act, 46 U.S.C. § 1117 (1970) to amend the contract to remove the domestic trading restrictions. The Secretary has recognized that her discretion to do so is not unlimited, *see* the

Secretary's proposed rule, *Construction-Differential Subsidy Repayment, Total Repayment Policy*, 43 Fed.Reg. 51045 (1978) (to be codified in 46 C.F.R. § 276.3), and must be exercised consistent with the overall purposes of the Act.

**18.** Compare Majority Op. at ———— of 194 U.S.App.D.C., at 822–823 of 595 F.2d.